STATE of Minnesota, Respondent,

v.

Louis Cardona BUGGS, Appellant.

No. C0–97–833.

Supreme Court of Minnesota.

July 16, 1998.

Rehearing Denied Aug. 12, 1998.

330

Steven P. Russett, Assist. State Public Defender, St. Paul, for Appellant.

Louis Cardona Buggs, pro se, Stillwater.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, for Respondent.

## OPINION

STRINGER, Justice.

Following a jury trial in Hennepin County District Court, appellant Louis Cardona Buggs was convicted of first-degree murder of Kami Talley. On appeal, appellant claims that the trial court committed reversible error in admitting the victim's statements identifying appellant as her assailant, in not limiting the scope of the state's evidence of appellant's prior assault of the victim, and in not providing the jury with any guidance to resolve a deadlock in its deliberations. Appellant further claims that he was deprived of his right to a fair trial by the improper exclusion of a juror in violation of both his and the juror's equal protection rights and through a pattern of prosecutorial misconduct. We affirm.

Appellant and Kami Talley met and began dating when they were both in high school. Their relationship lasted approximately 7 years. When they were both 18 years old they had a daughter, Ambreen Denise Buggs and later purchased a home together. In the spring of 1995 however, when their relationship began to founder, Talley and Ambreen moved out to live with Talley's maternal grandmother, Rose Napue.

On August 19, 1995, appellant learned that Talley was dating someone else. Appellant immediately confronted Talley and punched her repeatedly in her head with closed fists. Appellant pled guilty to fifth-degree assault and was sentenced to 365 days in jail, all but 120 days stayed, and was placed on probation for two years. Part of his probation included the condition that he not contact Talley or their daughter. Despite the no-contact order however, appellant continued to call Talley and Talley would occasionally bring their daughter to visit with appellant when appellant was out of jail on work release. Appellant completed his jail sentence on January 2, 1996. On Friday, February 9, 1996, appellant called Talley at Electric Wire Products, an assembly plant in Minneapolis where Talley worked as a clerk. Talley's mother, Deborah Woods, testified that she listened in on this call through a three-way conference and heard appellant demand money from Talley and threaten that Talley would "get what's coming" to her. Woods immediately notified the probation department. Because appellant's probation officer Roy Elliot was not there, Woods spoke with Renee Louck, a fellow probation officer. Louck spoke with Talley, confirmed that appellant violated the

no-contact order, and drafted an arrest and detention order for appellant. The order was issued that day.

On Monday, February 12, 1996, appellant's probation officer learned of the arrest and detention warrant and called appellant to inform him of the situation and to advise him to turn himself in. Appellant told him that he was aware of the warrant because Talley had called him over the weekend and left a message for him to watch his back. Appellant told his sister, Lena Buggs, about the warrant and she testified that appellant told her that he would either have to be shot or he would commit suicide, but he was not going back to jail. Lena Buggs also testified that approximately one week before Talley's murder appellant told her that he was upset with Talley because he was not able to see their daughter, and that "if she kept it up, she was going to make him kill her."

At 8:30 a.m. on February 14, 1996, Talley arrived to work at Electric Wire Products. Sometime around 9:15 a.m., Talley's supervisor, William McLellan, heard raised voices in the lunchroom area and upon investigation he determined the voices were coming from the women's restroom located off of the lunchroom. He heard two voices—Talley's and that of an unidentified male. McLellan was about to push open the door when he heard Talley say "no" three times, the male voice say "You bitch," and then a gunshot. McLellan immediately turned and ran to evacuate his employees from the building. As he did so he heard repeated gunfire.

At approximately 9:18 a.m., Minneapolis police officers were dispatched to Electric Wire Products. After speaking with some people outside the building, Sergeant Carl L. McCarthy determined that he and two other officers would have to enter the building because someone might be hurt. At about 9:31 a.m., McCarthy and the two officers walked up the steps to the second floor where McCarthy noticed on one of the steps a small, red paper bag with a hole in the bottom of it. As McCarthy and the officers entered the lunchroom area they heard a faint voice crying for help from the women's restroom. McCarthy entered and found Talley lying on the floor on her back in a pool of

blood, saying "I can't breathe. I can't breathe." McCarthy asked her who did this to her, and she replied "Butch." When he asked her again, Talley replied "Buggs." Butch was appellant's nickname.

The paramedics arrived around 9:34 a.m. and transported Talley to the hospital. While en route, one of the paramedics asked Talley who shot her, but she was unable to respond. The doctor in the emergency room determined that Talley had six gunshot wounds in her chest and abdominal area, a wound on her left thigh, and a wound on her left arm and that she was in hypovolemic shock. At approximately 10:10 a.m., Talley was taken into surgery and almost immediately went into cardiac arrest. She was pronounced dead at 11:06 a.m. An autopsy determined that the cause of Talley's death was multiple gunshot wounds to her chest and abdomen. The medical examiner testified that Talley had eight gunshot wounds, most likely resulting from seven shots. One bullet entered her left arm and fractured her radius, one bullet entered her left thigh and the other bullets struck her lungs, liver, diaphragm, spleen, left kidney, and colon.

That same day, at approximately 9:00 a.m., appellant called Lena Buggs and told her that he was leaving town and he would contact her after things "cooled down." Sometime later that morning appellant and two friends, Joaquin Bowers and Ramon Garcia, left Minneapolis and headed for San Antonio, Texas where Bowers' former girlfriend Rachel Contreras lived. Appellant and his friends arrived at Contreras' home at about 7:30 a.m. the next day. Contreras learned later that morning that Talley had been killed and appellant was a suspect in her murder. Contreras confronted appellant and he told her that "he made sure that [Talley] was not going to be able to spend his money, she was not going to be able to screw some other guy, and that she was not going to be able to see her daughter, either." During this exchange, Contreras observed a gun in the waistband of appellant's pants that he later took out and placed on the couch. She knew it was an automatic type gun because she saw a gun clip. Appellant asked to use Contreras' car to go to Mexico because he

did not want to use a car with Minnesota plates. Contreras initially refused but she eventually allowed appellant and his friends to drive her car to the border.

The Minnesota Fugitive Task Force, an organization made up of members from various local and federal law enforcement agencies, tracked appellant to several locations in Mexico and eventually to Alexandria, Virginia, where appellant was staying with his sister, Lori Buggs. On April 20, 1996, appellant was arrested in Alexandria, Virginia and was later extradited to Minnesota and indicted for first-degree murder.

At trial, strong circumstantial evidence was presented to link appellant to Talley's murder. Julie Blilie, a receptionist at Electric Wire Products, testified that she briefly observed a man whose description possibly matched appellant's run by the front office with a red bag in his hand around 9:15 a.m. on the day of the murder. The red bag observed by McCarthy on the steps was determined to be a Hallmark gift bag with the words "Filled with Love" written on the outside, which Blilie identified as the bag she had observed earlier. Upon examination, a crime scene technician and a forensic scientist found gunshot residue and a 9–millimeter Luger fired shell casing inside the bag. The gift bag was tested for fingerprints, and seven latent prints were developed. Appellant's right thumbprint was a match for a print recovered on the outside of the gift bag, by the letter "D." No other fingerprints were recovered from the crime scene.

Other evidence presented at trial further linked appellant to the shooting. The police recovered from the restroom where Talley was shot paper fragments matching the gift bag and six spent bullet casings stamped "FC 9 mm Luger." Although no gun was recovered, it was determined that the murder weapon most likely was a 9–millimeter semi-automatic pistol. Lena Buggs testified that when she lived with appellant and Talley in late 1994 and early 1995, appellant had a 9–millimeter gun. A search of Lori Buggs' house incident to appellant's arrest revealed a gun case and a magazine that contained twelve 9–millimeter bullets, five of which were stamped "FC 9 mm Luger."

After two days of deliberation, the jury found appellant guilty of first-degree murder in violation of Minn.Stat. § 609.185(1) (1996) and he was sentenced to a mandatory term of life imprisonment. Appellant appeals his conviction on five grounds: (1) the trial court committed reversible error by admitting Talley's statements to Sergeant McCarthy identifying appellant as her assailant under the dying declaration exception to the hearsay rule; (2) the trial court committed reversible error by refusing to limit the scope of the state's evidence relating to appellant's prior assault of Talley; (3) the trial court committed reversible error by not providing any guidance to the jury on how they should resolve their deadlock; (4) the appellant was deprived of his right to a fair trial through the improper exclusion of a juror in violation of both his and the juror's equal protection rights; and (5) the appellant was deprived of his right to a fair trial through a pattern of prosecutorial misconduct. We consider each of these issues.

## I. Dying Declaration

The trial court ruled that Talley's statements to Sergeant McCarthy identifying appellant as her assailant were admissible under the dying declaration and residual exceptions to the hearsay rule. The admission of evidence rests within the sound discretion of the trial court, and a determination that a statement meets the foundational requirements of a hearsay exception will not be found erroneous absent a clear showing of abuse of discretion. *State v. Bergeron,* 452 N.W.2d 918, 923 (Minn.1990).

In a homicide prosecution, "a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" is admissible as an exception to the hearsay rule under Minn. R. Evid. 804(b)(2). Appellant argues that the record does not support that Talley made the statements under a belief of impending death. Accordingly, the appellant argues, the trial court's decision to admit the statements was prejudicial error and requires that the appellant be granted a new trial.

This court laid out the foundational requirements for admission of a dying declaration in *State v. Elias*, 205 Minn. 156, 285 N.W. 475 (Minn.1939). We noted that in order for a dying declaration to be admissible, something more must be shown than simply that the declarant is aware of the seriousness of his or her injuries and the possibility of death. *Id.* at 158, 285 N.W. at 476. The statement "must have been spoken without hope of recovery and in the shadow of impending death." *Id.* at 159, 285 N.W. at 477. Thus the decisive factor is the declarant's state of mind which must be shown by competent evidence and cannot be left to conjecture. *Id.* "Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence." *Id.* at 159, 285 N.W. at 477 (quoting *Shepard v. United States*, 290 U.S. 96, 100, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (citation omitted)).

Later cases from this court reiterate that something more than the seriousness of the victim's injuries and the possibility of death must be shown in order to make a statement admissible as a dying declaration, and that the decisive factor is the declarant's state of mind. *Bergeron*, 452 N.W.2d at 922–23 (Minn.1990); *State v. Lubenow*, 310 N.W.2d 52, 56 (Minn.1981); and *State v. Eubanks*, 277 Minn. 257, 262, 152 N.W.2d 453, 456–57 (1967). The declarant's state of mind may be shown not only through direct evidence, such as a statement expressing the declarant's conviction that he or she is dying, but it also may be inferred from all of the surrounding circumstances. *Eubanks*, 277 Minn. at 262, 152 N.W.2d at 457; *State v. Brown*, 209 Minn. 478, 484–85, 296 N.W. 582, 586. (1941).

The trial court heard evidence establishing that Talley was shot seven or eight times in her chest, abdomen, arm, and thigh. The bullets struck her lungs, liver, diaphragm, spleen, left kidney, and colon. When Sergeant McCarthy found her, she was lying on her back on the floor in a pool of blood, "squirming," and struggling to breathe. He asked her at least twice who had done this to her and both times she identified the appellant. When the paramedics arrived, Talley told them that she could not breathe, and that she needed oxygen. She was taken to the hospital where the emergency room physician determined she was in hypovolemic shock. She died of cardiac arrest approximately two hours after she had been shot.

This court has stated that the seriousness of a decedent's wounds and the fact the decedent dies soon after making the declaration are circumstantial evidence of the declarant's belief in impending death. *Bergeron*, 452 N.W.2d at 923. The declarant in *Bergeron* had been stabbed eight times, and was found lying in a pool of blood. *Id.* His lungs and abdominal cavity were filled with blood from the wounds, and one of the stab wounds severed his spinal cord, most likely paralyzing him. *Id.* The officer and paramedic on the scene testified that the victim's breathing was extremely labored and that he kept saying "I can't breathe," and the paramedic testified that the victim started to go into severe shock. *Id.* The one distinguishing fact between *Bergeron* and the present case is that the victim in *Bergeron* stated "I'm dying aren't I?" to which the paramedic replied "It doesn't look too good." *Id.* In the instant case, Talley never said "I am dying," nor was she ever told that she would probably die. However, this court noted in *Elias*, that "[d]espair of recovery may indeed be gathered from the circumstances if the facts support the inference. There is no unyielding ritual of words to be spoken by the dying." 205 Minn. at 159, 285 N.W. at 477 (quoting *Shepard*, 290 U.S. at 100, 54 S.Ct. 22 (citations omitted)). *See also Brown*, 209 Minn. at 484–85, 296 N.W. at 586 (the declarant's state of mind may be shown by circumstantial evidence "where the facts shown support such an inference to the required degree.")

The seriousness of Talley's wounds, together with her labored breathing, her squirming and struggling for breath, and her death within two hours of making the statements are sufficient circumstances from which the trial court could conclude that Talley made the statements identifying the

appellant with a firm belief in her impending death. Because the admission of evidence rests within the sound discretion of the trial court and we find no abuse of discretion here, we hold that the trial court did not err in ruling that Talley's statements met the foundational requirements of a dying declaration.

## II. Prior Assault

■■■ Appellant next argues that the trial court committed reversible error in not limiting the scope of evidence relating to appellant's prior assault of Talley. Evidence of a prior assault, or "character evidence," is inadmissible to prove the character of a defendant in order to show that the defendant acted in conformity with that character in committing the offense with which he or she is charged. However, evidence of a prior assault may be admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b). To admit the evidence the trial court must determine that there is clear and convincing evidence that the defendant committed the prior bad act and that the probative value of the evidence outweighs any potential for unfair prejudice. *State v. Mills,* 562 N.W.2d 276, 285 (Minn. 1997) A reviewing court generally defers to the trial court's discretion in admitting prior bad acts and will reverse only upon a showing of clear abuse of discretion. *Id.*

The trial court admitted this evidence as proof of motive, intent, and identity. Appellant was on probation for assaulting Talley and facing the unwelcome prospect of returning to jail because she notified the probation office that he violated the no-contact order. Appellant's desire to stop Talley from testifying about his probation violation and to avoid going back to jail demonstrates a motive to kill her. Additionally, the prior assault clearly demonstrates the strained nature of the relationship between appellant and Talley. "Character evidence which tends to show the 'strained relationship' between the accused and the victim is relevant to establishing motive and intent and is therefore admissible." *Mills,* 562 N.W.2d at 285. Here, there is no question that appellant committed the prior assault or that the

evidence is probative; the only issue is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

This court has defined prejudice "to mean only 'the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'" *State v. Townsend,* 546 N.W.2d 292, 296 (Minn.1996) (quoting *State v. Cermak,* 365 N.W.2d 243, 247 n. 2 (Minn.1985)). In *Townsend,* the defendant was charged with murder and attempted murder. *Id.* at 295. The defendant moved to sever the murder and attempted murder trials and to suppress all evidence relating to the attempted murder in his murder trial. *Id.* The trial court denied defendant's motion and allowed the state to introduce evidence regarding the defendant's attempted murder, including testimony from the victim in the attempted murder case, testimony from six other witnesses as to the appearance of the crime scene and the appearance of the victim's wounds, and large color photographs of the crime scene. *Id.* This court held that admission of extensive and repetitious evidence relating to the other crime was error, because it "could do nothing but inflame the jury improperly." *Id.* at 296.

Here, the state introduced a variety of evidence relating to appellant's August 19, 1995 prior assault on Talley, including evidence that appellant was lifting weights and was "bulked up" at the time of the assault, testimony that appellant assaulted Talley in front of their four-year-old daughter, testimony from Talley's mother, Deborah Woods, that Talley called her immediately after the assault and Woods picked her up and took her to the hospital, testimony from the emergency room physician who treated Talley right after the assault, testimony from the police officer who arrested appellant and wrote the police report, testimony from the police officer who interviewed Talley, and four photographs of Talley's injuries.

Although some of this evidence may have been cumulative, the majority of it, with the exception of Woods' testimony, took only a portion of a morning and was not excessively explicit or inflammatory. The four photographs shown to the jury were not overly

inflammatory or graphic, especially in comparison to the autopsy photographs. In addition, the trial court did limit the scope of the evidence introduced by excluding certain hearsay statements the victim made to the police officer interviewing her after the assault and excluding as hearsay all statements made by Talley concerning abuse and threats by the appellant. Finally, at the beginning and again during the testimony relating to the prior assault the trial court specifically instructed the jury that they could only use the evidence for the limited purpose of showing motive, intent, or identity, and that the jury could not convict appellant on the basis of the prior incident. The trial court repeated these instructions to the jury at the close of trial. We conclude that on the basis of these facts, the trial court clearly did not abuse its discretion in admitting the prior assault evidence.

### III. Jury Instructions

■ The appellant next contends that the trial court committed reversible error by not providing any guidance to the jury as to how it should resolve a deadlock. After testimony, the trial court charged the jury. The trial court read CRIMJIG 3.04, the standard jury charge regarding unanimous verdicts in criminal cases.[1] The trial court also charged the jury as follows: "All of you must agree upon your verdict. Some of you may have been jurors on civil matters where you were permitted, after so many hours of deliberation, to return a so-called five-sixths verdict. There are no fractional verdicts in a criminal case. The jury's verdict must be unanimous."

The jury began deliberating in the afternoon of February 10, 1997. Although the record is sketchy, it appears that not long after deliberations commenced that day, the jury requested that the entire testimony of Sergeant McCarthy and the paramedic on the scene be read back to them. Their request was denied. In the morning of February 11, the jury sent a note requesting either the written reports of the police officers on the scene of the murder or the answer to the questions of whether McCarthy included in his report that Talley identified appellant as her assailant and whether he told any of the officers at the scene of her identification. The defense opposed granting either request, asking that the jury be left to its collective memory as to the evidence. At 2:30 p.m., the court sent a note to the jury refusing its request and charging it to "try to resolve these issues yourselves, if you can do so, without my answering the questions for you or rereading the testimony."

The jury sent another note at some point after 2:30 p.m. on February 11, stating that it had reached an impasse, and that it would be impossible to reach a unanimous verdict without the testimony of the police officers on the scene. This time, the defense requested that the court instruct the jury that a verdict of not guilty does not need to be unanimous, and that either the court not reread any of the testimony that the jurors requested, or that it reread all of it. Instead, the court sent a response to the jury telling them they should "[c]ontinue to try to work through your impasse." The jury sent one more note that afternoon asking how long they had to continue to deliberate that evening, and that while they were still at an impasse, "further *introspective* contemplation of the issue" might be helpful. The court responded by informing them they may retire for the evening. The next morning, on February 12, the jury returned a guilty verdict.

Appellant argues that the trial court erred in instructing the jury to continue deliberating and by not rereading CRIMJIG 3.04 to the jury, because the jury may have concluded that they were required to deliberate until they reached a unanimous verdict. If a trial

---

1. CRIMJIG 3.04 provides in part:
 You should discuss the case with one another, and deliberate with a view to reaching agreement, if you can do so without violence to your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced that they are erroneous but you should not surrender your honest opinion simply because other jurors disagree or merely in order to reach a verdict.
 10 Minn. Dist. Judges Assn., *Minnesota Practice*, CRIMJIG 3.04 (3d ed.1990).

court believes a jury is unable to agree, it "may require the jury to continue their deliberations and may give or repeat an instruction * * *. The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." *State v. Kelley*, 517 N.W.2d 905, 909 (Minn.1994) (quoting A.B.A. Standards for Criminal Justice § 15–4.4(b) (1986)). "[I]t is reversible error in Minnesota to coerce a jury towards a unanimous verdict. A court, therefore, can neither inform a jury that a case must be decided, nor allow the jury to believe that a 'deadlock' is not an available option." *State v. Jones*, 556 N.W.2d 903, 912 (Minn.1996) (citations omitted).

Appellant's reliance on *State v. Kelley* is misplaced. While in *Kelley* we granted the defendant a new trial because the trial court provided virtually no guidance on how the jury was to handle a deadlock, the facts are quite different from those at hand. *Kelley*, 517 N.W.2d at 910. In Kelley, the trial court initially read CRIMJIG 3.04 to the jury. *Id.* at 907. The jury subsequently sent the trial court two notes indicating deadlock and the exact numerical split, and requesting advice. The trial court responded to those notes, telling the jury to "continue deliberations" and "keep working," without consulting or notifying counsel, or making a record of the communication. *Id.* at 907–8. We concluded that the trial court's communications were not coercive on their face, but may have led the jury to conclude they were required to deliberate until a unanimous verdict was reached on each count. *Id.* at 909. In so concluding, we were particularly troubled by the ex parte nature of the communications because the defense could have requested that the court reread CRIMJIG 3.04 or some other suitable course of action. *Id.* at 909–10. In contrast, the notes sent by the trial court in the present case stating "try to resolve these issues yourselves, if you can do so" and "continue to try to work through

your impasse" would not lead the jury to conclude they were required to deliberate until a unanimous verdict was reached; further the notes were sent to the jury with trial counsel's knowledge, albeit not necessarily with their approval.

Our decision in *State v. Jones* is more on point. In *Jones*, the trial judge did not read CRIMJIG 3.04, but did charge the jury almost verbatim with the "fractional verdict" charge used in the case at hand. *Jones*, 556 N.W.2d at 907. After a day of deliberation the jury sent a note indicating it had reached an impasse, and the trial judge advised the jury to continue deliberation. *Id.* After another day the jury sent another note indicating the exact number split (11–1 for guilty) and the reason the one juror was holding out. *Id.* at 907–8. The trial court denied a mistrial request and read CRIMJIG 3.04 to the jury. *Id.* at 908. After a third day of deliberation the jury returned a guilty verdict. *Id.* We held that the combination of the trial court's two instructions, taken as a whole, "amounted to an adequate description of the jury's role and duty," and did not coerce the jury to reach a unanimous verdict. *Id.* at 911–12. We further noted that the period of jury deliberations was not excessive in light of the length and complexity of the trial and that "[n]either the paraphrased initial instructions nor the later instructions to keep deliberating went beyond the discretion afforded a trial court in the management of the trial." [2] *Id.* at 912.

Given that the trial court initially read CRIMJIG 3.04 and the noncoercive nature of the trial court's notes, the fact that the defense was fully advised of the notes, and that the jury's deliberations were not excessive in light of the length and complexity of the trial, we conclude that the jury was fully able to discern the limits of its obligations and was not coerced to reach a verdict. Accordingly

---

**2.** While the *Jones* court did mention that part of its decision in finding no error was influenced by the trial court's reading of CRIMJIG 3.04 when the jury reached a deadlock, it did not, as the appellant suggests, require that a trial court must always read that charge if a jury indicates deadlock. *See Jones*, 556 N.W.2d at 911. The trial

court in *Jones* did not read CRIMJIG 3.04 in the initial instructions, a fact that this court noted did pose some risk of creating a misunderstanding. *Id.* In contrast, the trial court in the present case did read CRIMJIG 3.04 in the final charge to the jury.

we hold the trial court did not abuse its discretion in charging the jury.

## IV. Exclusion of a Potential Juror

▮ During jury selection the state exercised a peremptory challenge to remove potential juror number 32. Juror number 32 is white but has an African–American daughter and is sometimes mistaken for a Native American. The defense opposed the use of the strike arguing that juror number 32 was removed because she expressed concerns about the lack of minorities on the jury panel and how people of color are treated by the system in general. The defense contended that the peremptory challenge was racially motivated and deprived appellant and the juror of their right to equal protection. The trial court ruled that it was an appropriate peremptory strike.

▮ The use of peremptory challenges to exclude persons from the jury solely on the basis of race is prohibited by the Equal Protection Clause of the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Supreme Court set out a three-step process in *Batson* to determine whether a peremptory challenge was motivated by racially discriminatory intent. First, the defendant must make a prima facie showing that the challenge was exercised on the basis of race. *Id.* at 96, 106 S.Ct. 1712. Second, upon such a showing, the burden shifts to the prosecutor to articulate a race-neutral reason for the challenge. *Id.* at 97, 106 S.Ct. 1712. Finally, the trial court must determine whether there has been purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712; *State v. Gaitan*, 536 N.W.2d 11, 15 (Minn.1995). If a prosecutor had a racially discriminatory intent or motive in striking a juror, a defendant is automatically entitled to a new trial because harmless error impact analysis is "inappropriate in the case of a defendant convicted by a petit jury if there was racial discrimination in the selection of that jury." *State v. McRae*, 494 N.W.2d 252, 260 (Minn.1992).

▮ The trial court correctly determined that the defendant did not make a prima facie case that the challenge was exercised on the basis of race. We have stated the "[a] prima facie case of racial discrimination is established by showing that one or more members of a *racial group* have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was based on race." *State v. Stewart*, 514 N.W.2d 559, 563 (Minn.1994) (emphasis added). Juror number 32, as a caucasian woman, is not a member of any racial minority, despite the composition of her family. While it is true that *Batson* has been extended to white venire members who are struck on the basis of their race,[3] juror number 32 was not excluded on the basis of her race even if one accepts as true appellant's argument that she was excluded solely because of her beliefs that people of color are treated unfairly by the system. *Batson* protects the potential juror's racial status, not her racial and political beliefs or philosophies. While juror number 32 may have appeared to be an ideal juror from the defense perspective, the state could well have perceived her as someone with an agenda who was predisposed to acquit—as the trial court noted in its ruling, "[t]hat's what perempts are for." Despite appellant's urgings to the contrary, we do not believe *Batson* should be extended to apply to a juror's beliefs or philosophies. Accordingly, we hold that the use of a peremptory strike violated neither appellant's nor the potential juror's constitutional right to equal protection.

## V. Prosecutorial Misconduct

▮ A prosecutor may not seek convictions at any cost and has the obligation " 'to guard the rights of the accused as well as to enforce the rights of the public.' " *State v. Salitros*, 499 N.W.2d 815, 817 (Minn. 1993) (quoting I ABA Standards for Criminal Justice, The Prosecution Function 3–1.1 and Commentary at 3.7 (2 ed.1979)). But even if prosecutorial misconduct is present, the defendant is not entitled to a new trial where we can say with certainty that the miscon-

3. *State v. Knox*, 609 So,2d 803, 806 (La.1992); *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir.1989).

duct was harmless beyond a reasonable doubt. *State v. Ashby*, 567 N.W.2d 21, 27–28 (Minn.1997). "If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *Id.* at 28; *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997).

As a threshold matter, we note the highly-charged context of this trial. The testimony and evidence presented spanned almost two weeks and from start to finish both sides vigorously tried their case. Almost every motion and ruling was contested and at times emotions ran high. Against this backdrop, appellant sets forth several categories of prosecutorial misconduct.

■ We first briefly address appellant's claims that do not rise to the level of prosecutorial misconduct:

—*Offering the contents of police reports.* The prosecutor attempted to offer a police report and the contents of a recorded dispatch call in an effort to rebut the defense's suggestion that Sgt. McCarthy fabricated Talley's identification, and that the only reason appellant became a suspect was because police were told by co-workers that Talley had an abusive ex-boyfriend. On both occasions the defense made a hearsay objection.[4] Appellant argues that it was improper for the prosecutor to offer inadmissible evidence or to ask legally objectionable questions. The state contends that both the police reports and the recorded message were clearly admissible because they were not offered for their truth but rather to show that it was unlikely Sergeant McCarthy fabricated Talley's identification. While the trial court did not admit the police report, it ruled that the contents of the dispatch recording were admissible under the state's theory. We conclude that it was not error to attempt to offer the two items if the prosecutor believed there was a legitimate evidentiary argument for their admission.

—*Attempts to introduce inadmissible evidence.* On two occasions, the prosecutor asked questions of police officers that may have resulted in the admission of hearsay:

Q: Were you able to obtain any information from these employees you spoke with?

A: Yes. They stated that—

[Defense attorney]: Objection, Your Honor. It calls for hearsay.

\* \* \*

Q: What information did you get from dispatch, sir?

[Defense attorney]: Objection, Your Honor.

On neither occasion was hearsay admitted. Obviously it was not error for the prosecutor to ask questions that were designed only to elicit evidence from the officers as to what actions they took based on information they received and did not call for hearsay.

■ Next, we address appellant's several claims of misconduct that although technically rising to the level of inappropriate conduct, are clearly not sufficiently prejudicial as to warrant reversal:

—*Attempts to introduce evidence the trial court ruled inadmissible.* Appellant contends that the prosecutor tried to elicit that Talley's employer had implemented security measures for her after the prior assault incident over repeatedly sustained relevancy objections by the defense, and tried to elicit statements Talley made to others about appellant's abuse and threats. While it is error for a prosecutor to persist in asking questions ruled improper or elicit evidence ruled inadmissible, *State v. Harris*, 521 N.W.2d 348, 354 (Minn.1994), our careful review of the record leads us to the conclusion that any inappropriate conduct here was inadvertent and surely did not contribute to the verdict.

—*Asking appellant to comment on the credibility of another witness.* On cross-examination of the appellant, the prosecutor asked appellant about Rachel Contreras' account of the events, and when appellant denied that Contreras asked him why

---

4. At one point after a hearsay objection by the defense, the prosecutor personally directed her comments to the defense attorney. While this

was improper, the trial court found that it was not intentionally done in order to force the defense to object.

he did not just go through the courts to get visitation with his daughter, the prosecutor asked: "So if Rachel testified to that fact before this [c]ourt and jury, then Rachel is either lying or mistaken, true, sir?" Appellant contends that the question was argumentative and improper because credibility determinations are within the sole province of the jury. The state contends that it was a legitimate attempt to highlight a serious credibility issues—namely, that the testimony of appellant and Contreras could not be reconciled. The error, if any, was harmless because the appellant simply reiterated his claim that he did not speak with Contreras in any depth at all.

*—Asking the jury to draw adverse inferences from appellant's exercise of his constitutional rights.* The prosecutor asked several questions on cross-examination of appellant that highlighted his opportunity to hear all the evidence and see all the reports. Later, in closing arguments, the prosecutor argued that appellant took advantage of his opportunity to observe the full presentation of the case in the courtroom and then took the witness stand and concocted a story exonerating himself.[5] Appellant argues that although the defense did not object, it was plain error that violated his Sixth Amendment right to be present during trial and confront the witnesses against him, citing *Agard v. Portuondo*, 117 F.3d 696, 707–08 (2d Cir.1997), for the principle that it is improper to argue that the defendant gained a tactical advantage through the exercise of his or her constitutional rights.[6] It should be noted that *Agard* only addresses comments made by the prosecutor in closing arguments, not during cross-examination, because constitutional issues raised by the remarks "either are not present or are of less concern when made upon cross-examination", due to the opportunity of defense counsel to rehabilitate the defendant's credibility. *Id.* at 708. Additionally, the *Agard* court noted that the prosecutor made the comments insinuating fabrication for the first time during summation, a fact the court found troubling, because the remarks occurred too late for the defense attorney to even respond. *Id.* at 708 n. 6, 709, 711.

We hold that the prosecutor's remarks did not amount to prejudicial error because in addition to the defense's failure to object and preserve that issue for appeal, the defense had an opportunity to rehabilitate the appellant on re-direct and to respond to the remarks in closing argument, clearly lessening the possibility that the remarks contributed to the verdict. However, given the constitutional implications that such commentary raises, we caution prosecutors that extensive dwelling on a defendant's presence during the trial may result in reversible error in future cases, especially where there are no facts in evidence to support an inference of fabrication, or there is no opportunity to rehabilitate the defendant.

*—Attempts to shift the burden of proof.* When cross-examining appellant, the prosecutor asked him if he had receipts to substantiate his claims that he sold his car, that he stopped at an ATM the morning of Talley's murder, that he stopped to buy gas on the way to Texas, or that he purchased the gift bag in November. The trial court overruled the defendant's objection that the prosecutor was attempting to shift the burden of proof to appellant, but during the interrogation and in the final jury charge it instructed that the defendant had no burden of proof. In addition, the trial court sustained an objection to the prosecutor's use of the word "incumbent," in the prosecutor's question: "it's incumbent upon you as a witness who takes the

---

5. In the defense's closing argument, counsel emphasized that appellant had every right to be present at trial and review the evidence in advance, just like every other defendant, and that no adverse conclusions should be drawn from appellant's exercise of those rights.

6. *Agard* notes that the highest courts in Connecticut, Maine, D.C., Vermont, and Massachusetts, as well as an intermediate court in Washington, have agreed that such commentary is improper. However, the Michigan Supreme Court, and the intermediate appellate courts of Minnesota, *see State v. Grilli*, 369 N.W.2d 35, 37 (Minn.Ct.App. 1985), *rev. denied,* (Minn. Aug. 30, 1985), New Jersey, and Texas hold the opposite.

witness stand to explain why your fingerprint is on the bag; isn't that true?" We hold that any error that may be implicit in the prosecutor's questions is nonprejudicial and harmless in light of the trial court's clear and thorough instructions that the appellant had no burden of proof or duty to produce evidence.

—*Improper Closing Argument.* Appellant claims that the prosecutor committed misconduct in closing arguments by attempting to generate sympathy for the victim, by commenting improperly on the effect Talley's death had on her family and community, and by attacking appellant's character when she called him a "coward" for not committing suicide after he shot Talley.

■ In a homicide prosecution, the state may offer information about the victim's life, but may not use it as an attempt to influence the jury's decision on the basis of prejudice or passion. *State v. Hodgson,* 512 N.W.2d 95, 97 (Minn.1994) (allowing the state to play a 45-second video tape of the victim playing basketball to show victim as a person). *See also State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985) ("The victim was not just bones and sinews covered with flesh, but was imbued with the spark of life. The prosecution has some leeway to show that spark and present the victim as a human being as long as it is not 'an attempt to evoke any undue sympathy or inflame the jury's passions.'") It does not appear that the prosecutor's attempt to present Talley as a thoughtful, friendly, hard-working individual and the mother of a four-year-old child, or showing Talley's picture before and after her death goes beyond the pale of giving the victim "a spark of life," nor was its matter-of-fact nature likely to inflame the jury's passions. We also note that the defense did not object to any portion of the closing referencing Talley's background, suggesting that the defense did not regard the comments as problematic and in any event constituting a waiver of the objection. *State v. Ture,* 353 N.W.2d 502, 516 (Minn.1984).

■ Appellant also objects to references to the community in which Talley lived and worked. In *State v. Lewis,* we did not find prejudicial misconduct in a closing argument where the prosecutor made similar statements describing how the murder affected the friends and family of the victim as well as how it "shattered that sense of security and community and safety in a Saint Paul neighborhood * * * [and affected] all the citizens of the state of Minnesota." 547 N.W.2d 360, 364 (Minn.1996). We noted that the remarks about the family of the victim "simply described the inevitable result of the murder," and were not made to inflame the jury's passions. *Id.* We conclude that while the remarks about the effects on the community here were problematic in potentially diverting the jury's attention away from its role of determining whether appellant is guilty or not guilty, reversal is not warranted because the comments made up only a small portion of the closing argument and simply described the inevitable result of the murder.

■ Finally, we hold that the prosecutor's references to appellant as a "coward" with a "twisted" thought process were improper comments, but the remarks do not require a new trial. They were isolated comments and given the mass of evidence at this lengthy trial they surely did not contribute to the jury's verdict. See *State v. Ives,* 568 N.W.2d 710, 713–15 (Minn.1997) (it was misconduct for the prosecutor to argue the defendant was a "would-be punk[ ]" with a "pathetic little li[fe]", but the comments were not so prejudicial as to require a new trial because the comments were harmless beyond a reasonable doubt).

■ We now turn to the last two claims of prosecutorial misconduct which we conclude are of far more serious nature: First, during the testimony of defense witness Lori Buggs, several jurors overheard one of the prosecutors whisper to co-counsel: "She's lying." The next day one of the jurors advised the court about the comment. Four jurors actually heard the remark, and all but two eventually learned about it. The trial court and counsel extensively questioned each juror individually, the voir dire comprising approximately 30 pages of transcript. Each juror stated that the comments would not affect his or her ability to fairly and indepen-

dently evaluate Lori Buggs' testimony. Accordingly, the trial court denied defense's motion for a mistrial, concluding that the misconduct was unintentional and that the jury had acted properly.

 As every prosecutor should know, it is improper to express a personal opinion about the credibility of a witness. *State v. Ture*, 353 N.W.2d at 516. The misconduct here could very possibly have been the basis for a mistrial and but for the very extensive questioning by the court and counsel of each juror and each juror's response that his or her ability to assess the credibility of the witness was not affected by the remark—in fact, some jurors had a negative reaction toward the prosecution because of it—we could well conclude the remark was sufficiently prejudicial as to require a new trial. The court's inquiry resolves the issue however, and coupled with the instruction to the jury to ignore the comment further insulated the appellant from any possible prejudice, we conclude the trial court did not abuse its broad discretion in denying defendant's motion for a mistrial.

 The second claim of misconduct of a more serious nature arose following the questioning of the jurors about the counsel's comment. The trial court drew the prosecutors' attention to the prosecutors' use of body language, observed not only by the jurors but by court personnel and spectators, in the nature of facial expressions of disgust when the trial court ruled against the prosecution, or the defense asked questions that the prosecution apparently thought inappropriate. One of the jurors informed the court that several jurors were alienated by the prosecutors' conduct. The trial court ruled that the offensive conduct was not intentional, and noted that he permitted it to the point where it became a distraction because "I decided

that that's your way of trying a case and if that's the way you want to come across to a jury, that's your business." We find no prejudice to appellant because of the prosecutors' amateur displays, particularly in light of the jury's expressed impatience with their conduct, but we do not take lightly conduct that demeans other participants in the trial and the court.

While none of appellant's claims either singly or in the aggregate denied appellant his right to a fair trial or contributed to the verdict, the prosecutor's comments about a witness's credibility and repeated expressions of disgust with the defense's case and the court's rulings raise such troubling concerns of professional misconduct that they should be called to the attention of the Lawyers Professional Responsibility Board. While vigorous prosecution certainly need not be lifeless prosecution, where it has the potential for distracting the jury from its proper role, undermining the integrity of the legal profession, and offending the dignity of the court, it cannot be disregarded.

Despite our strong distaste for such conduct however, we conclude that the appellant was not denied a fair trial.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. I do so because, while I agree with the court in all other respects, I believe the court's conclusion that the state's peremptory strike of juror 32 did not constitute a prima facie case of racial discrimination under *Batson v. Kentucky*,[1] and its progeny is error.

Prior to striking juror 32, the prosecutor asked the juror a short series of questions, each of which was rooted in issues of race.[2] The prosecutor asked no questions of juror

---

1. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. Q. Good afternoon, ma'am.
 A. Hello.
 Q. I want to go back to something you talked about with Mr. Lucas and kind of your impressions when you came in at that first kind of gathering that we had when we first called all the jurors together. You know, you indicated some concern about the system, given that you

looked around and there were only a few people of color in the room, and I think you said something like the 1950's Minnesota or something. Do you have any perception or information in terms of kind of how that happens or who controls that or where that comes from, that kind of makeup of a group?
 A. Well, looking at the division—I found out that the zip code I gave you was incorrect. I didn't realize. I had just recently moved and I had the wrong zip code, so I was looking in the

32 unrelated to race. After asking those questions, the prosecutor excused juror 32 without explanation. In response to defendant's objection that the prosecutor's rejection of juror 32 violated the principles set out in *Batson,* the prosecutor argued that *Batson* did not apply. In agreeing with the prosecutor, the trial court stated, "I think it is not a *Batson* challenge. The woman was caucasion." [3]

Ignoring juror 32's relationship with the African–American man she lives with and her interracial daughter and the fact that in reality, juror 32 was excluded, not because of her beliefs about race and the justice system, but because of the prosecutor's concerns about race, the court summarily concludes that because juror 32, as a caucasian woman, is not a member of any racial minority, a prima facie case of racial discrimination has not been made out.

"Race may be America's single most confounding problem, but the confounding problem of race is that few people seem to know what race is." [4] In part, what makes race a confounding problem and what causes many people to not know what race is, is the view that the problems of race are the problems of the racial minority. They are not. The problems of race belong to all of us, no matter where our ancestors come from, no matter what the color of our skin. Thus, concluding that race is not an issue in this case because juror 32 is not a member of a racial minority, misses the point. Race is an issue.

phone book and that's when I realized this is a county court, so it's not just the City of Minneapolis. It's all of these, and some of the prospective jurors are from the outlying suburbs, and so it is reflective of the county, I am sure. It just isn't reflective of the city.

Q. And did that information kind of change maybe how you felt when you saw that or not?

A. That day, yes.

Q. Do you have some concerns about the system in general treating people of color fairly?

A. Yes, I have concerns about it.

Q. Can you verbalize that at all, explain that to me what you are thinking?

A. It all kind of falls back on the media. If I watch the news, if there is a crime committed, and this is my opinion now. I will just be honest about it, if the person that they have as a suspect is black, their picture is flashed on the entire screen. If the person is caucasian, rarely do you see a picture, and so my family and friends that live in the outlying parts of the state, I get this sense of fear from them, and I think that it ahs [sic] been promoted by the media.

Q. And how do you see that played out in the courtroom here in Hennepin County in terms of what happens in these cases?

A. I don't have any experience with it, I am sorry, but I—that was my feeling is that, you know, if that assembly room of jurors reflected what I have known in my acquaintances or just people when I was looking to rent a place.

Q. Were different?

A. It's different. Because I am caucasian, I hear things from caucasian people that they wouldn't talk about around black people.

Q. And given that you are being talked to in a case where you can expect to be a juror and the defendant is African–American, how do you [sic] beliefs about what we are facing as a society here, how do those beliefs affect how you would sit as a juror in a case like this where we do have a defendant of color?

A. I feel—well, the reason I wanted to be a juror so there would be somebody who doesn't have that fear base.

Q. And would you treat this defendant in this case differently based on the fact that he is a person of color and not a white person?

A. No. I didn't know when I saw that assembly room that it was going to be a person of color. I didn't know anything about the case, so I—

Q. And is it kind of your belief or your expectation of your decision making that the defendant's race should not enter into your decision about the facts of the case?

A. No. I don't feel that I would be affected by race.

Q. And do you feel that it's likely or possible that you would hold the state to a higher burden of proof because of the fact that the defendant is a black man?

A. No.

MS. HANNON: May I have a moment, Your Honor?

THE COURT: Yes.

MS. HANNON: Thank you, ma'am. Your Honor, the state would excuse Ms. Deponty.

3. The trial court judge went on to say, "I was wondering if they were going to ask her any questions at all. I could see her as someone they may have stricken without even inquiring, but their questions did only go to essentially race issues, but I am not willing to expand it to a caucasion who may be living in a primarily minority family * * *."

4. Ian F. Haney López, *The Social Construction of Race: Some Observations on Illusion, Fabrication, and Choice,* 29 Harv. C. R.-C. L.L.Rev. 1, 5–6 (1994).

Issues of race are difficult and raise difficult questions. Resolution of these issues and questions will not come easily and taking the easy road will not bring about resolution. To achieve resolution, we must first have the ability to recognize issues of race when they come before us. To do so, we must look beyond the limited box of our own experience. In this case, that means being able to see and understand the racial impact of permitting prosecutors to exclude from service prospective jurors who do nothing more than express concerns about the racial makeup of the jury panel and our justice system's treatment of people of color. Once we recognize that issues of race are before us, we must then determine whether race has played an impermissible role. In doing so, we must be critical in our analysis. Finally, if we conclude that race has played an impermissible role, we must be courageous in acting to eradicate the resulting bias. As a court, our commitment to eradicate racial bias from our judicial system must ground itself in concrete common sense actions whenever and under whatever guise that bias manifests itself.

If we are to root out racial bias from the judicial system, as we have an obligation to do under both the United States and Minnesota Constitutions, and, as we have said we would in the Final Report of the Task Force on Racial Bias in the Judicial System,[5] we must do more than ask the simple surface question of whether juror 32 was excluded because of her race; we must look deeper and go on to ask whether race played an impermissible role in her exclusion. In *City of Minneapolis v. State by Wilson*,[6] we held that under the Minnesota Human Rights Act, racial discrimination against a person is forbidden "whether it is based on a person's race or the person's *association* with people of color."[7] Thus, although juror 32 is caucasian, her association with people of color may

form the basis for the conclusion that her exclusion was impermissibly race based and is, at a minimum, sufficient to make out a *prima facie* case under *Batson*. Beyond juror 32's association with people of color, it is clear that issues of race played a role in her exclusion. The record shows that, during voir dire, juror 32 expressed concerns about the lack of minorities on the jury panel as well as the general treatment of people of color by the judicial system and that the only questions asked juror 32 by the prosecutor concerned race. In *State v. McRae*,[8] a Hennepin County prosecutor peremptorily removed a prospective African–American juror who expressed concern about the treatment of people of color by the judicial system. Based on defendant's objection, the trial court evidently found that a prima facie case under *Batson* had been established.[9] In rebutting the prima facie case, the prosecutor claimed that because the juror thought the system was unfair, she could not be impartial.[10] The trial court concluded that "there was an articulable basis for the prosecutor's challenge"[11] and permitted the juror to be struck. Presumably, what the trial court meant by the term "articulable basis" was that the prosecutor's response was race-neutral and nonpretextual. On appeal, we disallowed the strike, stating:

> [O]n the record we have, the juror in question appears to have simply answered the prosecutor's questions—which the prosecutor had not asked of other potential jurors at that point—in the same way that a large percentage of fair-minded, reasonable black people and fair-minded reasonable people of any other race would have answered the questions. To allow the striking of this juror on the basis of those answers in effect would allow a prosecutor to strike any fair-minded, reasonable black

**5.** *See* Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, *Final Report*, May 1993, 32–38 (hereinafter "Task Force Report").

**6.** 310 N.W.2d 485 (Minn.1981).

**7.** *Id.* at 487 (emphasis added).

**8.** 494 N.W.2d 252, 253–58 (Minn.1992).

**9.** While the trial court did not make an explicit finding, such a finding is implied by the fact that the trial court went on to analyze the challenge under the second and third prongs of the *Batson* test. See *id.* at 256.

**10.** *Id.*

**11.** *Id.*

person from the jury panel who expressed any doubt the [sic] "the system" is perfect.

Moreover, one of the reasons the prosecutor gave for striking the African American juror was that he believed she might refuse to find defendant guilty simply because defendant was also a black person. As the prosecutor put it, " '[S]he thought that basically the system is unfair to minorities, and the defendant's being black is—and her being black she would over compensate by basically letting this guy off.' " "Batson expressly forbids this type of reasoning to enter into the jury selection process."[12]

Given our ruling in *McRae,* it is clear that, had juror 32 been a person of color, a prima facie case under *Batson* would have been made out and the state would not have been able to exclude juror 32 "solely because of her beliefs that people of color are treated unfairly by the system." More would have been required; the state would have been required to articulate race-neutral grounds for its peremptory strike. Juror 32 should not be treated differently simply because she is caucasian. Applying *McRae* to the facts in the record before us, the prosecutor's strike of juror 32 is invalid.[13]

I find some degree of irony in this court's holding that the peremptory strike of juror 32 was permissible based on her belief that our judicial system treats African–Americans and other people of color unfairly. After all, she did nothing more than give voice to concerns this court raised in its Task Force Report. That report contains over 70 findings detailing racial bias in the judicial system. Findings from the report with respect to juries state:

*Findings*

\* \* \* \* \* \*

2) Jury pools rarely are representative of the racial composition of a community.

3) People of color have a general distrust of the criminal justice system and exclusion from jury service fosters that distrust.

\* \* \* \* \* \*

5) Juries are generally made up of white middle class people. Without the broad range of social experiences that a group of diverse individuals can provide, juries often are ill-equipped to evaluate the facts presented in cases that involve people of color.

6) Lack of understanding among whites creates an opening for unconscious prejudice and racial bias when evaluating the facts of a case concerning people of color.

7) Grand and petit juries need people of color to truly reflect the whole community if the jury's verdict is to reflect the community's judgment.[14]

Even the trial court recognized that although juror 32 was caucasion, her diverse experience, living with an African–American man and having an interracial child, would have brought a range of social experiences to the jury that are generally not represented.[15]

By this decision, the court permits the state to exclude from jury service any "fair-minded, reasonable \* \* \* person from the jury panel who expressed any doubt \* \* \*

---

12. *Id.* at 257 (emphasis added).

13. In this case, the trial court concluded that a prima facie case had not been made out and therefore did not proceed further with the *Batson* analysis. As a result, the record contains no explanation, race-neutral or otherwise, for the prosecutor's strike of juror 32. Because the trial court in the first instance is generally in a better position to evaluate the facts and circumstances surrounding the exercise of peremptory strikes, remand for further proceedings will usually be the appropriate remedy. There may be times, however, when the record is such that the reviewing court can properly decide the validity of the strike. I believe this is one of those cases.

14. Task Force Report, *supra,* at 36.

15. In responding to the defense challenge, the trial court stated:

> I couldn't agree with you more, her answers made her seem like an ideal juror to try to get this to be as representative as possible of a jury from the pool we have to choose from \* \* \*. It's unfortunate, because she does add or would add more, if not minority representation on the panel, at least someone who lives and works and understands the black community, and I got that impression from her.

'the system' is perfect." [16] Based on the record before us, this court's conclusion that juror 32 was properly excluded by the trial court is error. Whether the prospective juror is a person of color or not, on the issues raised by this case, race matters. Permitting prospective jurors to be excluded from service because their personal experience bears out what we said in our Task Force Report, makes no sense, but does make a mockery of our efforts to bring about racial fairness. In saying this, I do not mean to call into question this court's commitment to eradicate racial bias from Minnesota's judicial system. We must, however, move beyond rhetoric.

In some respects, the problem appears to be more one of this court struggling to stay within what some consider to be the unworkable and ineffective analytical structure for challenging a prosecutor's race-based use of peremptory challenges set forth by the Court in *Batson* [17] as modified in *Purkett v. Elem.*[18] We should not feel limited by *Batson* and its progeny. *Batson* establishes the floor for challenging race based peremptory strikes. It does not set the ceiling. We may set higher standards to ensure that racial bias does not infect the selection of jurors.[19] Today's decision, as well as the Court's decision in *Purkett*, demonstrates to me that it is time for this court to consider seriously Justice Marshall's admonition in his concurrence in *Batson* that the goal of ending "the racial discrimination that peremptories inject into the jury-selection process * * * can be accomplished only by eliminating peremptory challenges entirely." [20] In that concurrence, Justice Marshall eloquently details the historical use of the peremptory challenge, beginning in the post-Civil War reconstruction era, to prevent African–Americans from serving on juries and the inadequacies of the remedy provided. Others have also detailed the peremptory challenge's use as a tool "to eliminate the new black faces appearing for jury duty" and its effectiveness as "an incredibly efficient final racial filter." [21]

Sitting here some 12 years after *Batson*, it cannot be said that its promise to eradicate racial bias from the jury selection process has been accomplished. Sadly, it has not. While *Batson* has made racial bias in the jury selection process harder to detect, that is not, as I have said before,[22] the same as making it go away. At a minimum, we should refer the issue of the continued use of the peremptory challenge to the Criminal Rules Committee for review, debate, and recommendation.

---

**16.** *McRae*, 494 N.W.2d at 257.

**17.** *See generally Batson*, 476 U.S. at 102–03, 106 S.Ct. 1712 (Marshall, J., concurring); Eric L. Muller, *Solving the Batson Paradox: Harmless Error, Jury Representation, and the Sixth Amendment*, 106 Yale L.J. 93 (1996); *see also State v. Gaitan*, 536 N.W.2d 11, 18–20 (1995) (Page, J. dissenting).

**18.** 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

**19.** *See generally State v. Russell*, 477 N.W.2d 886, 889 (Minn.1991) (noting that the Minnesota Supreme Court may apply a "more stringent standard of review" as a matter of state law under the state constitution's equivalent to the federal constitution's equal protection clause).

**20.** *Batson*, 476 U.S. at 102–03, 106 S.Ct. 1712.

**21.** Morris B. Hoffman, *Peremptory Challenges Should Be Abolished: A Trial Judge's Perspective*, 64 U. Chi. L.Rev. 809, 829 (1997).

**22.** *Hennepin County v. Perry*, 561 N.W.2d 889, 900 (Minn.1997) (Page, J., concurring).