## STATE EX REL. DONALD LEE FRUHRMAN v. RALPH H. TAHASH.

146 N. W. (2d) 174.

November 4, 1966—No. 39,938.

*J. Russell Carroll,* for appellant.

*Robert W. Mattson,* Attorney General, and *Gerard W. Snell,* Solicitor General, for respondent, warden of State Prison.

SHERAN, JUSTICE.

On December 18, 1954, Donald Lee Fruhrman was arrested on a murder charge. The following day he signed a written confession to the crime. The day after that an attorney was appointed to represent him as an indigent. On December 22, 1954, he appeared for arraignment with his attorney and pleaded guilty to first-degree murder.

On November 5, 1964, the District Court of Washington County issued the present writ of habeas corpus. An evidentiary hearing was held thereon December 15, 1964, at which defendant, represented by an attorney appointed by this court, appeared and testified. On April 22, 1965, that court discharged the writ. Defendant appealed.

Defendant contends that he was inadequately represented by counsel at his trial because his counsel had failed to move to suppress his confession; had failed to object to the written report of a doctor who examined him after his arrest with respect to his mental condition; and had failed to move to reduce the charge against him to murder in the third degree; and because the court had erred in accepting his plea of guilty to first-degree murder and in receiving in evidence the confession and written report of the doctor.

### Defendant's Confession

The questions of the competence of defendant's attorney in not moving to suppress the confession and the court's receiving the confession may be considered together, since it is clear that no inadequacy can be attributed

to counsel for failing to make a motion which should have been denied had it been made.

■ Defendant's confession was given orally to the county sheriff and after being transcribed was signed by defendant. At the time it was made, counsel had not been appointed to represent defendant. However, in the confession defendant stated that he was willing to answer the questions despite the fact that under the Constitution he did not have to answer them if he did not want to; that no one forced him to give the statement; that he had volunteered to a deputy sheriff that he wanted to make a clean breast of the matter; that no one had abused him the day of the confession and that the sheriff had never abused defendant in any way at any time; that the statement given was free and voluntary; that he would willingly sign it after its transcription if he found it true and correct; and that he would do so knowing it could be used against him in court.

On the other hand, one segment of the confession suggests involuntariness:

"Q. No one has abused you in any way, have they?

"A. No, only when I got hit over the head last night.

"Q. I mean today?

"A. No.

"Q. I haven't abused you in any way at any time, have I?

"A. No.

"Q. There hasn't any of my men here in this room abused you in any way, have they, today?

"A. No, not today."

At his habeas corpus hearing, defendant alleged other matters to show the confession was involuntary. He alleged that the sheriff threatened to turn him over to an angry mob; that deputies slapped him; that he was never advised of his right to consult with counsel or that what he said could be used against him at trial; that he unsuccessfully requested counsel; that he was not given food; that he was held incommunicado; and that he was hit over the head a number of times—three or four of which were with the barrel of a gun. Defendant's own testimony was the

only evidence offered of these facts. While it was not rebutted by testimony, much of it is rebutted by defendant's own sworn confession:

(1) The confession shows he was advised anything he said could be used against him before he signed the confession.

(2) His statement in the confession that the only way he was abused was being hit over the head tends to rebut his present claim that he was also subjected to threats of being turned over to a mob, slapped, held incommunicado, refused a request to see counsel, and denied food.

(3) His statements that the confession was made without force, voluntarily, willingly, and with knowledge that it could be used against him tend to completely refute his ultimate claim, of which the particular incidents he alleges are only indicia or facets, that his confession was involuntary.

It is probably true that criminal defendants attacking the voluntariness of confessions should not always be absolutely bound by their own statements that the confession is voluntary. There are several reasons for this:

(1) The statement the confession is voluntary may itself sometimes be an involuntary statement.

(2) The defendant may not have fully appreciated the meaning of the terms of the question, such as the words "voluntarily" or "intelligently."

(3) The court does not wish to apply any type of estoppel against the criminal defendant—its only concern is to find out whether the confession was in fact voluntary or not.

However, in the present case, these reasons have not been shown to be applicable. Moreover, the statements as to the confession's voluntariness are viewed, not alone, but together with the fact that certain of his specific allegations are belied in the confession. Considering the evidence as a whole, a finding that the confession was voluntary would have to be sustained.

■ Defendant's confession being voluntary, it was admissible at the time of the proceedings in question, notwithstanding defendant may have been, as he now asserts he was, denied his request for counsel, or

that he was not informed he could confer with counsel before making any statement. Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. (2d) 977, filed June 22, 1964, and Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. (2d) 694, filed June 13, 1966, which make those factors determinative of the admissibility of confessions, do not apply to persons whose trials began prior to their dates of decision. Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. ed. (2d) 882.

■ Regardless of this, since defendant has not shown that the confession formed a basis for his conviction,[1] the issue of its voluntariness appears to be immaterial in the present proceedings. His plea of guilty was made after consultation with counsel and after conferring with his minister in the court's chambers, where the indictment was explained to him. It also appears that his plea was made and accepted by the court without any reference to the confession. It was only after the court accepted his plea that it directed that the confession, as well as the report of Dr. Patterson and the testimony of the sheriff, be made a part of the record, not for the purpose of establishing defendant's guilt, which by then had been admitted, but rather so that reference to these documents and such testimony might be made in any future proceedings such as the present. These factors compel the conclusion that the confession was not a factor in defendant's conviction.

### Defendant's Guilty Plea

■ Defendant also claims he was coerced into entering his guilty plea. However, his testimony in the present proceedings regarding the circumstances surrounding the plea is so incredible and inconsistent with the record that the trial court was amply justified, in the absence of any corroborating evidence, in finding it untrue. His claims therein that a "mob" had threatened him with violence and had followed the sheriff's car to the jail where he was incarcerated; that during this trip the sheriff had

---

[1] Compare, State v. Richter, 270 Minn. 307, 133 N. W. (2d) 537 (guilty plea based upon genuine misapprehension state could use evidence procured by illegal search), and State v. Kramer, 272 Minn. 454, 139 N. W. (2d) 374 (guilty plea not based on inadmissible confession).

threatened to turn him over to the "mob" if he did not confess and plead guilty; and that when his appointed counsel came to confer with him at the jail the only words he spoke were "I'm your lawyer, plead guilty," and that he then walked out, are incredible to us and apparently were incredible to the trial court. His testimony that he feared Judge Barron, an honorable and distinguished jurist of substantial legal capacity, and that Judge Barron had told him to plead guilty after his arrest and before his arraignment; that the "mob" was still clamoring for him some 2 days later (during the winter in northern Minnesota) when he appeared in court for arraignment with his counsel; that the sheriff again threatened to turn him over to the "mob" if he did not plead guilty; and that during a 25-minute recess taken to permit defendant to confer with his counsel, counsel spoke not a word, is likewise unbelievable to anyone knowing the character of Judge Barron, the location of the crime, and the circumstances under which it was committed. It is not surprising that the trial court completely disregarded this testimony. Defendant's adroit responses to the questions propounded to him at his hearing manifested an intelligence far superior to that which he would have the court believe he possessed. Such responses disclosed a mind which fully understood what evidence was necessary if he were to be successful in obtaining a determination that the taking of the confession and his arraignment and plea had been in violation of his constitutional rights.

■ Defense counsel's claimed incompetence in failing to move for a reduction of the charge from murder in the first degree to that of murder in the third degree and the propriety of the trial court's accepting a plea of guilty to murder in the first degree may be considered together, because, as noted above, counsel cannot be deemed incompetent for failing to make a motion that should have been denied had it been made, and because of the similarity of function in counsel's advising, and a trial court's accepting, a guilty plea.

Defendant contends that notwithstanding all the foregoing, the evidence is clear, not only from his confession but from the sheriff's statements at his arraignment, that only a plea of guilty to murder in the third degree was in order. Defendant points out that Minn. St. 1961, § 619.10, in effect at the time of the crime, provided that the "killing of a

human being * * * without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, any felony [with specified exceptions]" is murder in the third degree, while Minn. St. 1961, § 619.07, provided that killing with a premeditated design to effect death was first-degree murder. He contends that a plea of guilty to the latter could not properly be advised by counsel or accepted by the trial court.

Defendant points to portions of his confession and of the statements made by him at his arraignment as indicating that had he stood trial there was evidence from which a jury might have found that the killing of the station attendant here was not premeditated and that defendant's guilt was that of murder in the third degree. Thus he stated in his confession that the attendant "was going to hit me with something and the gun went off, and I didn't mean to do it. I just didn't know what I was doing." Asked how long he planned this holdup, he replied, "I didn't even plan it"; and asked how it happened, he replied, "I don't know. I was just sitting there and all at once, I just did it"; that after he had asked the man for money, he had a little trouble with him; that he did not think he had pulled the gun out when he asked the attendant for the money and thought the gun was still in his coat; that he did not tell the man it was a holdup; and that after he asked the man for money the man was going to hit him, he pulled out the gun, it went off, and then "I just stood there and shot." In the sheriff's statements at the arraignment, it was made to appear defendant had taken the victim's money.

Opposed to such testimony is the evidence that defendant actually fired at least five bullets into his victim's body, as well as statements relating to other factors which we have held sufficient to establish murder in the first degree. See, State v. Ware, 267 Minn. 191, 126 N. W. (2d) 429. Under our decisions, it is clear that premeditation and design, essential to establish murder in the first degree, being products of the mind and wholly subjective, are often incapable of direct proof but may be inferred from the circumstances which surround a homicide, such as the fact the perpetrator has prepared himself with a loaded firearm, thereby being evidently ready to shoot, if necessary, anyone who might obstruct his criminal purpose, and the manner in which the shooting is accomplished. See, State v. Gowdy, 262 Minn. 70, 113 N. W. (2d) 578.

Defendant's assertions do not clearly and unequivocally indicate innocence of the crime charged. Compare, State v. Olson, 270 Minn. 329, 133 N. W. (2d) 489. We have held, albeit in a case involving a plea to a lesser offense, that a guilty plea is properly accepted when made by a defendant advised by competent counsel where, even accepting his assertions at arraignment as correct, the possibility of acquittal under the original charge seems remote. State v. Ingram, 273 Minn. 356, 141 N. W. (2d) 802. We have also indicated that the tardiness with which a defendant raises the point that his guilty plea should not have been received is a relevant consideration. State v. Searles, 274 Minn. 199, 142 N. W. (2d) 748 (3 years). Here defendant brought his petition 10 years after his conviction.

The trial court was fully justified in finding that defendant's plea was made intelligently and with full realization of the consequences. The sentencing judge gave defendant a 25-minute recess for the express purpose of conferring with his attorney as to the elements of first-degree murder. The trial court was justified in disbelieving defendant's assertion that during this 25 minutes his counsel spoke not a word. After returning from this recess, defendant, asked whether he understood the indictment, said, "I understand it now." The trial court's finding that the sentencing judge properly accepted defendant's plea and that defense counsel was competent is sustained by the evidence.

This is not a case in which the sentence exceeds that which could have lawfully been imposed for the conviction. See, State v. Pederson, 251 Minn. 372, 88 N. W. (2d) 13. Here the conviction was for first-degree murder and the life sentence conforms thereto. Neither is it one where there is no evidence to sustain the judgment of first-degree murder so that on appeal the judgment should be changed to one of third-degree murder. Compare, State v. Jackson, 198 Minn. 111, 268 N. W. 924. As noted above, the evidence would have sustained a jury verdict of first-degree murder had there been a trial.

■ Defendant's assertions as to the receipt of the doctor's report have been examined and found to be without merit. As noted above, the report was not introduced into evidence until after defendant had admitted his guilt by his plea. In addition, the trial court could well reject

defendant's present claim that the doctor had no prior acquaintance with defendant, since the doctor was superintendent of the mental institution at which defendant had been confined intermittently for a number of years.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting in part).

I am of the opinion that statements made by defendant in his confession and at his arraignment indicate that there would have been much evidence from which a jury might have found that his killing of the station attendant was not premeditated and that his guilt would be for that of murder in the third degree under Minn. St. 1961, § 619.10.

Thus, he stated in his confession that the attendant "was going to hit me with something, and the gun went off, and I didn't mean to do it. I just didn't know what I was doing." Asked how long he had planned this holdup, defendant replied, "I didn't even plan it"; and asked how it happened, he replied, "I don't know. I was just sitting there and then all at once, I just did it"; that after he had asked the man for money, he had had a little trouble with him; that he did not think he pulled the gun out when he asked the attendant for the money, although he was not sure, but thought the gun was still in his coat; that he did not tell the man it was a holdup; and that after he asked the man for money, he (the attendant) was going to hit him (the defendant) and that he pulled out the gun and it went off and then "I just stood there and shot."

While there is no doubt in my mind that the evidence as a whole would support a verdict of murder in the first degree, I feel that because of these statements, and because of defendant's deficient mentality, the case should be remanded for conviction and imposition of sentence for the crime of murder in the third degree rather than murder in the first degree. This would give defendant the benefit of the doubt on the inferences which might be drawn from his statements with respect to his intentions at the time the crime was committed.