# STATE v. JAMES EUBANKS.

152 N. W. (2d) 453.

July 21, 1967—No. 39,905.

*Douglas Hall,* for appellant.

*Douglas M. Head,* Attorney General, *Gerard W. Snell,* Solicitor General, *George M. Scott,* County Attorney, and *Harlan M. Goulett,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

Defendant appeals from a judgment of conviction of murder in the first degree.

An indictment charging this crime (Minn. St. 609.185[1]) was returned by the grand jury of Hennepin County on March 11, 1964, against defendant. On April 14, 1964, defendant was by order of the district court transferred from the Hennepin County jail to Hennepin County General Hospital for a psychological and psychiatric examination. A report of such examination was returned to the court under date of May 15, 1964.

Defendant entered a plea of not guilty and at the commencement of the trial on September 21, 1964, waived his right to a jury trial. Following the trial the court found defendant guilty of murder in the first degree and sentenced him to life imprisonment. On this appeal defendant seeks reversal of the judgment of conviction and a remand to the district court for a new trial.

STATEMENT OF FACTS

On March 2, 1964, in the city of Minneapolis, defendant stabbed Susan Lawson, inflicting several wounds from which she died at General Hospital at 12:32 a. m. March 3, 1964.

The evidence produced at the trial can be separated into three cate-

gories, namely, the life of James Eubanks, the slaying, and the psychiatric testimony. The first segment encompasses defendant's pathetic early years in the Negro ghetto of St. Louis, depicting his life with 12 brothers and sisters in a fatherless home and the most primitive living conditions. Defendant's adolescent period is a picture of violence and brutality, theft, and gambling, combined with an almost total absence of education in the segregated school system. From an early age he was subject to racial indignities, resulting in an attitude of hostility and embitterment. Defendant moved to Minneapolis in August 1962 to live with relatives. In the fall of 1963, at the age of 21 he went to work for Baker Properties, Inc., as an evening janitor, taking classes during the day at Central High School.

The second phase of the testimony consists of the gruesome account of the murder. Susan Lawson was 20 years of age at the time of her untimely death. For the past 2 years she had been employed as a microfilm operator for Investors Diversified Services, Inc., in Minneapolis. On the night of March 2, 1964, she and two other girl employees were working overtime on the second floor in the microfilm area of the Investors Diversified Services Building in downtown Minneapolis.

On the same night defendant reported to work about 6:30 p. m. Before reporting he had called his employer, stating that he was ill and could not report for work. However, his employer, unable to find a replacement for him on such short notice, told defendant to come to work. He arrived for work, changed into his uniform, and obtained a knife which he often used to scrape gum and other substances from the floors. He proceeded to do his work which consisted of sweeping and cleaning the floors.

At approximately 8 p. m. defendant arrived at the microfilm area where Susan and the two other girls were working. Shortly thereafter one of the girls quit work and went home. At about 8:40 p. m., while defendant was still cleaning the area, the other girl left the microfilm area to go to another part of the building. At this time Susan continued working on her microfilm camera. When the coemployee returned about 5 minutes later, Susan was missing and the machine she had previously been operating was still running, causing microfilm cards to overrun the tray on

her machine and spill onto her chair and the floor. Susan could not be found. There was no sign of a struggle. Her coat and other personal belongings were still there, as was defendant's cleaning equipment. After looking for Susan in the aisles between the metal filing cabinets and noticing defendant's mop lying in one of the aisles during her search, the employee realized that something must have happened. As Susan's workmate started to go for help, she heard a scream. Susan was running at the far end of the microfilm area and holding her side as blood ran down her dress. The two girls ran toward each other, Susan saying, "Diane, I have been stabbed. Let's get out of here." Susan said that the Negro janitor had stabbed her and dragged her down the stairs. She kept saying, "Call a doctor, call a doctor, I am dying. Call the priest."

Susan was admitted to General Hospital at 9:08 p. m. and died shortly after midnight, March 3, 1964. At about 10:45 the evening of March 2, 1964, a detective with the Minneapolis Police Department talked to Susan. He testified that she then said:

"* * * [I]t was the colored janitor. * * * He wore a blue uniform with the word James on it. * * * He come up to my desk and said that he wanted to have intercourse with me.

* * * * *

"He wanted to have intercourse with me, and I refused. He pulled his knife out and he led me from the office down the flight of stairs to the next room and he opened the door with a key and when he got me in there he says, 'Take off your clothes, I am going to have intercourse with you.' * * * I again refused but I took off my shoes and I seen a chance to make a break for it and when I did he grabbed me and knocked me to the floor and he stabbed me and he stabbed me, * * * I had enough strength and I got up and I got the door open and I screamed and I ran up the stairs and he ran the other way."

Susan died less than 2 hours after giving this statement.

After defendant stabbed Susan, he left the IDS Building, went across the street, and asked the receptionist at the North Star Inn to phone the police. While the receptionist was phoning the police, defendant walked away. Within the hour he walked into the street, flagged down a police car, and surrendered to the police.

The third phase of the testimony represents the bulk of the three-volume transcript and consists of testimony of a number of leading psychiatrists and psychologists who classified defendant's personality as sociopathic, bordering on psychotic, with paranoid ideation.

The defense also introduced testimony by medical experts relating to the medical and criminal criteria of mental illness. Further, there was a great deal of testimony concerning the M'Naghten rule as a test of criminal responsibility.

■ Defendant on appeal assigns as error that the trial court allowed and received testimony of police officers concerning statements made by defendant at the time of his apprehension and statements allegedly made in the police station. The record clearly indicates that in several instances defendant admitted his guilt either to police officers or to other persons who testified as witnesses at his trial.

The transcript shows that almost all of the incriminating statements were given voluntarily and did not come as a result of questioning by police officers. For instance, after defendant was first placed in a police car he made admissions to officers who were transporting him to Hennepin County General Hospital. At the hospital entrance defendant encountered the coworker of the victim and explained to her, "I'm sorry." That these statements were given voluntarily cannot be denied. The statements made in response to police questioning in the Homicide Office of the Police Department were largely a repetition of the previously volunteered statements.

Furthermore, the trial here occurred subsequent to Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. (2d) 977, and prior to Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. (2d) 694. Accordingly, this case is subject to the rule of Escobedo rather than the guidelines laid down in Miranda. See, Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. ed. (2d) 882; State ex rel. Fruhrman v. Tahash, 275 Minn. 242, 146 N. W. (2d) 174.

■ This court has, in its interpretation of Escobedo, determined that police failure to advise an accused of his right to silence does not in itself render his ensuing statements inadmissible in trials held before June 13, 1966. State v. Winge, 274 Minn. 571, 144 N. W. (2d) 704. The

test is one of voluntariness. In Culombe v. Connecticut, 367 U. S. 568, 602, 81 S. Ct. 1860, 1879, 6 L. ed. (2d) 1037, 1057 (cited with approval in State v. Taylor, 270 Minn. 333, 338, 133 N. W. [2d] 828, 832), the court said:

"* * * The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

There was no error in the reception of these statements.

■ As his second assignment of error defendant contends that testimony concerning the statements made by the victim to a police officer should not have been admissible as "dying declarations." The statements were made less than 2 hours prior to Susan's death. While there is some difference of opinion with respect to the factors which should determine the admissibility of such statements, the general rule in Minnesota is set forth in State v. Elias, 205 Minn. 156, 158, 285 N. W. 475, 476, as follows:

"In prosecutions for homicide the dying declarations of the deceased as to the cause of his injury or as to the circumstances which resulted in the injury are admissible if it be shown, to the satisfaction of the trial court, that they were made when the deceased was in actual danger of death and had given up all hope of recovery."

In 5 Wigmore, Evidence (3 ed.) § 1440, it is stated:

"* * * The essential idea is that the belief [of death] should be a positive and absolute one, not limited by doubts or reserves; * * *."

In ascertaining this consciousness of approaching death, Wigmore says that not only the statements of the declarant himself but all the attending circumstances should be considered. Id. § 1442.

The record shows quite clearly that Susan knew she was in imminent danger of death. She expressed this conviction not only in the hospital

to the police officer to whom she gave the statement about defendant, but also to her coworker shortly after the attack, and to another employee while waiting for an ambulance to arrive. The officer's testimony about Susan's statements was admissible under State v. Elias, *supra*.

■ Defendant's next claim is that Minn. St. 611.026, embodying the M'Naghten rule for criminal responsibility, violates the due process clause of the Fourteenth Amendment in that:

(1) The M'Naghten rule is proven invalid by "modern scientific knowledge."

(2) Defendant *may* meet the M'Naghten criteria but *not* other accepted tests of criminal responsibility.

Defendant contends that the trial court failed to discard § 611.026 or properly interpret the statute.

Section 611.026 provides:

"No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

Almost from its first pronouncement in M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718, decided in 1843, this rule has been subject to attack and criticism, particularly by the medical and, more recently, the psychiatric professions. Nevertheless, the M'Naghten rule has become almost universally the test of insanity in criminal cases. While we do not imply that the defense did not present a convincing case for the fact that the M'Naghten rule is an ancient and archaic test for criminal responsibility, in Minnesota its application is plainly required by statute. The legislature as recently as 1963 had an opportunity to reevaluate and reconsider alternatives to the M'Naghten rule and took no action, which must indicate an adherence to § 611.026. While it may be true that other tests of criminal responsibility would be more appropriate, the fact re-

mains that the legislature rejected an opportunity to change the law. Therefore, this court, in the exercise of judicial restraint, ought not to assume the awesome responsibility of doing so by statutory construction.

In 1960 this court was faced with a similar question. In State v. Finn, 257 Minn. 138, 141, 100 N. W. (2d) 508, 511, the defendant, appealing a conviction of first-degree murder, urged that "the M'Naghten test is unrealistic and deals in concepts of no real psychological significance." The court, after commenting upon the "irresistible impulse" test and the broad test of Durham v. United States, 94 App. D. C. 228, 214 F. (2d) 862, 45 A. L. R. (2d) 1430, said (257 Minn. 141, 100 N. W. [2d] 511):

"* * * Still other guides have been suggested as being substantial improvements over any test heretofore devised. But whatever the merit of these various concepts may be, if any change is to be made in this jurisdiction in the accepted standard of criminal responsibility, it must be done by the legislature. Section 610.10 [renumbered 611.026] defines clearly and unequivocally, in the language of the M'Naghten case, the only grounds upon which the defense of insanity is allowed. The test has been consistently applied in this state, at least in criminal matters, without modification. * * *

* * * * *

"* * * While changing conditions can and often do affect the construction of statutes, the courts cannot go beyond the plain and clear meaning of the statute to spell out some different meaning. Section 610.10 simply does not require judicial construction. If more adequate standards of determining criminal responsibility can be devised, it is the function of the legislature and not this court."

The question then becomes one of whether the application of § 611.026 violates defendant's rights under the due process clause of the United States Constitution. This, however, was answered in the negative in Leland v. Oregon, 343 U. S. 790, 72 S. Ct. 1002, 96 L. ed. 1302. In upholding the Oregon test (M'Naghten rule) for criminal responsibility, the Supreme Court said (343 U. S. 800, 72 S. Ct. 1008, 96 L. ed. 1310):

"* * * That statute amounts to no more than a legislative adoption of the 'right and wrong' test of legal insanity in preference to the 'irre-

sistible impulse' test. Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' "

■ Lastly, defendant argues that the expert testimony of a psychiatrist and neurologist, Dr. Robert P. Jeub, should not have been admitted. After reviewing the record as to Dr. Jeub's qualifications and training, we see no merit in that claim. On the contrary, it appears that his testimony, as well as that of another doctor who testified, aided the trial court in understanding current medical opinion on the function of the human mind in relation to criminal responsibility. Not only was the trial court justified in receiving the opinion of Dr. Jeub, but to have found such an opinion inadmissible would have been an abuse of discretion.

In Woyak v. Konieske, 237 Minn. 213, 221, 54 N. W. (2d) 649, 653, 33 A. L. R. (2d) 1241, 1247, this court said:

"Whether a sufficient foundation has been laid to qualify a witness as an expert ordinarily is a question for the trial court. We have repeated this rule so frequently that citation of authorities seems superfluous. 2 Dunnell, Dig. & Supp. § 3335. In Detroit Lakes Realty Co. v. McKenzie, 204 Minn. 490, 493, 284 N. W. 60, 62, we said:

" '* * * Whether a witness offered as an expert possesses the requisite qualifications involves so much of the element of fact that great consideration must necessarily be given to the decision of the trial judge; and his ruling will be sustained unless it is made clearly to appear that it was based upon some erroneous view of legal principles or that the ruling was not justified by the evidence presented to the judge at that time.' "

■ Viewing the record as a whole, there is ample evidence to justify a finding of guilt beyond a reasonable doubt.

Affirmed.