Gary L. ROBY, Appellant,

v.

STATE of Minnesota, Respondent.

No. A11–0450.

Supreme Court of Minnesota.

Dec. 28, 2011.

Gary L. Roby, Bayport, Minnesota, pro se.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and John J. Choi, Ramsey County Attorney, Michelle J. Fischer, Certified Student Attorney, Mark Nathan Lystig, Assistant County Attorney, Saint Paul, Minnesota, for respondent.

## OPINION

GILDEA, Chief Justice.

Appellant Gary Roby was convicted of aiding and abetting the crimes of first-degree premeditated murder, first-degree murder while committing aggravated robbery, and second-degree intentional murder for his role in the shooting death of Marlizza McIntyre. We affirmed Roby's conviction on direct appeal. *State v. Roby* (*Roby I* ), 463 N.W.2d 506 (Minn.1990). In this case, Roby appeals the denial of his third petition for postconviction relief. Because we conclude that the postconviction court properly denied Roby's petition, we affirm.

The facts surrounding Marlizza McIntyre's murder are set forth in detail in *Roby I.* *Id.* at 507–09. We limit our discussion of the facts to those directly relevant to this appeal. McIntyre was killed by one shot to the back of her head while she was being held down and robbed on May 22, 1989, in the kitchen of a Saint Paul apartment. Lillian Dunn–Simmons, Kenneth Fisher, L.Y., A.J., S.L., appellant Gary Roby, and two of appellant's brothers were all in the apartment at the time of the murder.

Fisher testified that on the day of the murder, yelling and screaming from the kitchen of the apartment woke him. When he went to investigate the noise, he saw McIntyre being held face down on the floor. Dunn–Simmons and appellant's brothers were holding McIntyre down while Roby straddled McIntyre's back and removed some of her jewelry and at least $80 from her bra. Fisher testified that Roby pulled out a revolver, pulled back McIntyre's hair, and shot her in the back of the head.

S.L. also testified that McIntyre was killed by a shot to the back of the head. But she said that Dunn–Simmons fired the fatal shot while an unknown black man held McIntyre down. The State, however, impeached S.L. with two prior statements in which she had indicated that the man holding McIntyre down was, or could have been, Roby.

L.Y. testified that she did not see the murder, but when she looked into the kitchen she saw Dunn–Simmons and Roby near McIntyre's dead body. She also testified that after the murder no one talked about what had happened.

A.J. testified that she saw McIntyre and Roby in the kitchen struggling for a gun with no one else near them. Then, McIntyre called Dunn–Simmons for help, and Dunn–Simmons joined the struggle. While all three were struggling for the gun, a shot was fired into the floor. After this initial shot, A.J. testified that Roby and McIntyre let go of the gun and Dunn–Simmons shot McIntyre.

In addition to the testimony described above, the State also relied on Roby's statements to police and the circumstances surrounding his arrest. When questioned, Roby gave the police conflicting stories,

but he eventually admitted to being involved in the events surrounding McIntyre's murder. He told police that Dunn–Simmons had asked him for shells and that he had sold her a revolver about a week before the murder. He further told the police he had a private conversation with Dunn–Simmons on the stairs leading up to the apartment just before the murder. During this conversation, Dunn–Simmons told Roby that she did not have any cocaine or money to pay for the gun he had sold her. But Roby told Dunn–Simmons "he knew where she could get [the money]." Dunn–Simmons then "indicated that they would go upstairs and get the money." Roby said that Dunn–Simmons never specifically said that they were going to rob McIntyre, but that is what he understood her statement to mean. Roby also admitted to having his hand on the gun when it fired.[1] When Roby was arrested, he was wearing a distinctive necklace known to be McIntyre's. While in jail awaiting questioning, Roby told Fisher that Fisher was a "dead man" for cooperating with the police. Roby also told Fisher that Fisher should tell the police that Roby found McIntyre's necklace on the floor.

Roby's defense at trial was that Dunn–Simmons, acting alone, decided to rob McIntyre and that Dunn–Simmons fired the fatal shot. Her motive for the killing, according to Roby, was to end a love triangle between Dunn–Simmons, McIntyre, and an unidentified man.

After being convicted, Roby filed a direct appeal. Roby argued that evidence was erroneously admitted, his constitutional right to confront witnesses was violated, he was denied effective assistance of coun-

sel, the State obtained his conviction through perjured testimony, and his right to due process was violated. We affirmed Roby's conviction, concluding that the State's evidence was "overwhelmingly persuasive of [Roby]'s guilt." *Roby I*, 463 N.W.2d at 510. Thereafter, Roby filed two postconviction petitions, one in 1994, and the other in 1995. We affirmed the denial of both postconviction petitions in *Roby v. State (Roby II)*, 531 N.W.2d 482 (Minn. 1995), and *Roby v. State (Roby III)*, 547 N.W.2d 354 (Minn.1996), respectively.

Roby filed this, his third petition for postconviction relief, on March 27, 2009. His petition is based on five pieces of evidence that Roby contends are newly discovered evidence, and he argues that his claims should be considered in the interests of justice. The evidence at issue is: a 1989 police report, a 2002 letter from Dunn–Simmons, a 2003 affidavit of V.C., a 2007 affidavit of T.B., and a 2008 affidavit of C.H.

The postconviction court originally dismissed Roby's entire petition as untimely under Minn.Stat. § 590.01, subd. 4(a) (2010), because Roby failed to specifically invoke an exception to the 2–year statute of limitations. Roby appealed, and we found that Roby had properly invoked the newly discovered evidence and interests of justice exceptions set forth in Minn.Stat. § 590.01, subd. 4(b)(2) and (5) (2010). Accordingly, we reversed and remanded to the postconviction court for a determination of whether Roby's petition was time-barred under Minn.Stat. § 590.01, subd. 4(c) (2010), and if not, whether he had actually established either of the invoked exceptions in Minn.Stat. § 590.01 subd.

---

1. Roby admitted he had his hand on the gun the first time it fired. There was a discrepancy in the testimony at trial as to how many times the gun was fired. Fisher testified that the gun was fired four times, and the police subsequently found one bullet lodged in McIntyre's head and three bullet holes in the floor.

4(b) (2010). *See Roby v. State (Roby IV)*, 787 N.W.2d 186, 191–92 (Minn.2010).

On remand, the postconviction court denied Roby's petition without an evidentiary hearing, holding that Minn.Stat. § 590.01, subd. 4(c) barred the claims that were based on the 1989 police report and the 2002 letter from Dunn–Simmons. Without considering whether Roby had actually established any of the exceptions listed in Minn.Stat. § 590.01, subd. 4(b), the postconviction court concluded that Roby's remaining claims failed on the merits. Roby appealed.

▇▇▇ On appeal from a postconviction court's denial of relief, the de novo standard applies to our review of issues of law and the clearly erroneous standard applies to our review of the court's findings of fact. *Riley v. State*, 792 N.W.2d 831, 833 (Minn. 2011). Postconviction courts are required to hold an evidentiary hearing unless "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2010); *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007).

Roby makes three arguments on appeal. Roby argues that the postconviction court abused its discretion when it found that portions of his petition were untimely. Roby also argues that the postconviction court abused its discretion when it denied him an evidentiary hearing on the portions of his petition that it found to be timely. Finally, Roby argues that to the extent his claims are untimely, we should nevertheless consider them under the doctrine of equitable tolling. We examine each issue in turn.

## I.

We turn first to the question of whether Roby's petition is timely. Petitions for postconviction relief are governed by Minn.Stat. ch. 590 (2010). The Legislature added a statute of limitations to the postconviction statute by amending section 590.01 in 2005. *See* Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1097–98. There are three different provisions in the limitations amendment, and all are relevant here. First, subdivision 4(a) in the amended statute provides that a petition for postconviction relief cannot be filed more than 2 years after the later of "(1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." Minn.Stat. § 590.01, subd. 4(a). The legislation amending the statute is effective as of August 1, 2005, and "[a]ny person whose conviction became final before August 1, 2005, shall have two years after the effective date of [the amendments] to file a petition for postconviction relief." *See* Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1097; *Stewart v. State*, 764 N.W.2d 32, 34 (Minn.2009). Second, the amended statute, in subdivision 4(b), sets forth five exceptions to the general timebar of subdivision 4(a). *See* Minn.Stat. § 590.01, subd. 4(b). And third, in subdivision 4(c), the statute provides that a "petition invoking an exception provided in [4](b) must be filed within two years of the date the claim arises." *Id.*, subd. 4(c).[2]

Roby's conviction became final in 1990, 90 days after we decided *Roby I*. *See Moua v. State*, 778 N.W.2d 286, 288 (Minn. 2010). In order to be timely under the general time-bar in subdivision 4(a), Roby therefore had to file his petition for postconviction relief by July 31, 2007, 2 years after the effective date of the amended postconviction statute. *Moua*, 778 N.W.2d

---

**2.** For purposes of this case we assume, without deciding, that a claim arises when a petitioner subjectively becomes aware of the basis for the claim.

at 288. Because Roby did not file his petition until March 27, 2009, his claims are time-barred under subdivision 4(a) unless he satisfies an exception under subdivision 4(b). But before examining whether Roby qualifies under an exception, we first determine whether he filed his petition in compliance with subdivision 4(c). In other words, we will determine whether Roby filed his petition within 2 years of the date his claimed exception under subdivision 4(b) arose. To the extent Roby's claims satisfy subdivision 4(c), we then turn to an examination of whether Roby has satisfied an exception under subdivision 4(b).

### A.

▮ The postconviction court concluded that Roby's claims based on the 1989 police report and the 2002 Dunn–Simmons letter were untimely under subdivision 4(c). Roby argues that that conclusion was erroneous.

With respect to the claim based on the 1989 police report, Roby admitted that he learned of the report in 2004. With respect to the claim based on the 2002 Dunn–Simmons letter, the latest Roby could be said to have learned of it was when he received the letter on or about November 3, 2003. Roby filed his petition more than 2 years after he learned of these claims. We therefore hold that the postconviction court properly found that these claims were untimely under Minn. Stat. § 590.01, subd. 4(c).[3]

### B.

The postconviction court held that Roby's claims based on the 2003 affidavit of V.C., the 2007 affidavit of T.B., and the 2008 affidavit of C.H. were timely under subdivision 4(c). The State does not challenge the court's conclusion, and so we assume, without deciding, that these claims satisfy subdivision 4(c), and turn to the question of whether these claims fall within an exception in subdivision 4(b).[4] Roby contends that his claims meet the newly discovered evidence and the interests of justice exceptions to subdivision 4(b).

### 1.

▮ We consider first whether any of Roby's claims satisfy the newly discovered evidence exception. The postconviction statute sets out the elements necessary to establish the exception for newly discovered evidence. Minn.Stat. § 590.01, subd. 4(b)(2). Those elements are:

(1) A petitioner must allege the existence of newly discovered evidence (including scientific evidence);

(2) The evidence could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the 2–year time period for filing a postconviction petition;

(3) The evidence is not cumulative to evidence presented at trial;

(4) The evidence is not for impeachment purposes; and

(5) The evidence must establish by the clear and convincing standard that the petitioner is innocent of the offense for which the petitioner was convicted.

---

**3.** The postconviction court's order cites subdivision 4(b) throughout its discussion of when the subdivision 4(b) claims arose, but this citation appears to be a typographical error. Given the court's analysis of when Roby's claims arose, it is clear that the court was applying subdivision 4(c).

**4.** The postconviction court did not analyze whether these three claims satisfied an exception under subdivision 4(b). The court instead concluded that the claims failed on the merits.

*Id.* The clear and convincing evidence standard is met "when the truth of the fact to be proven is 'highly probable.' " *Gassler v. State,* 787 N.W.2d 575, 583 (Minn.2010) (quoting *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978)). This means that the evidence alleged should be "unequivocal, intrinsically probable and credible, and free from frailties." *Id.* With this framework in mind, we turn to Roby's claims.

### V.C. Affidavit

Roby argues that he is due relief based on V.C.'s 2003 affidavit.[5] V.C. is a close relative of Dunn–Simmons. Roby subpoenaed V.C. to testify at the trial in 1989, but V.C. did not appear. In his affidavit, V.C. makes three statements potentially beneficial to Roby. First, V.C. states that he now believes that Dunn–Simmons killed Marlizza McIntyre. Second, he states that Fisher attempted to sell him a revolver in December of 1988. Third, V.C. states that he believes that A.J. was under the influence of drugs just after the time of the shooting. Roby argues that this evidence is material because it tends to undermine the credibility and perception of State witnesses and identifies Dunn–Simmons as the actual shooter.

The three factual assertions in V.C.'s affidavit fail under the statutory test because they are cumulative, impeaching, and do not clearly and convincingly prove Roby's actual innocence. *See* Minn.Stat. § 590.01, subd. 4(b)(2). That V.C. believes that Dunn–Simmons was the shooter is a bare assertion not supported by fact. V.C. was not present at the time of the murder and he offers no facts or reasoning for why he now believes that Dunn–Simmons was the shooter. Moreover, because Roby was convicted of aiding and abetting the murder, V.C.'s opinion that someone else was the shooter does not provide clear and convincing evidence of Roby's innocence. *See* Minn.Stat. § 609.05 (2010); *see, e.g., State v. Hawes,* 801 N.W.2d 659 (Minn. 2011) (affirming appellant's conviction for aiding and abetting first-degree murder where there was no evidence that appellant actually killed the victim). Finally, the statement that Dunn–Simmons was the shooter is cumulative because A.J. and S.L. testified to that effect at trial.

V.C.'s statement that Fisher attempted to sell him the weapon used in the murder does not clearly and convincingly prove Roby's innocence. Roby has made no

---

**5.** The postconviction court found that the V.C. affidavit failed on the merits under the newly discovered evidence test articulated in *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997), which requires a petitioner to establish that: (1) the evidence was not known to the petitioner or counsel at the time of trial; (2) the failure to learn of the evidence before trial was not due to a lack of diligence; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence would probably produce either an acquittal or a more favorable result. Specifically, the court found that the evidence contained in the affidavit was doubtful and not material because V.C. "has no first-hand knowledge of what occurred during the murder," and the evidence would not have produced a more favorable result at trial. Before assessing the merits of Roby's claim however, the postcon-

viction court should have assessed whether the claim satisfies the statutory criteria for the newly discovered evidence exception in Minn. Stat. § 590.01, subd. 4(b)(2). *See Gassler,* 787 N.W.2d at 582–83 (discussing and applying the statutory test for newly discovered evidence). While the postconviction court erred by applying *Rainer,* subdivision 4(b)(2)'s test is more stringent than the *Rainer* test so the court would have reached the same result if it had used the correct test. *Compare Rainer,* 566 N.W.2d at 695 (requiring that the petitioner establish that the newly discovered evidence would probably produce a more favorable result), *with* Minn.Stat. § 590.01, subd. 4(b)(2) (requiring that the petitioner establish that the newly discovered evidence clearly and convincingly proves his actual innocence).

showing that Fisher's possession of the murder weapon some 5 months before the shooting is relevant to what happened on the day of the murder. Moreover, there was ample testimony at trial that Roby owned the murder weapon after December 1988—including testimony that Roby admitted to police that he sold the gun to Dunn–Simmons a week before the murder.

Finally, V.C.'s statement that he believes that A.J. was under the influence of drugs just after the murder does not clearly and convincingly prove Roby's actual innocence. That A.J. was on drugs during the murder could be used to impeach A.J.'s credibility. But A.J.'s testimony largely mirrored the statements that Roby gave to the police about his involvement in the shooting. Like A.J., Roby stated that he struggled for the gun with McIntyre and Dunn–Simmons, and that Dunn–Simmons fired the fatal shot. In sum, Roby's claim based on V.C.'s affidavit does not satisfy the newly discovered evidence exception found in subdivision 4(b)(2).

### T.B.'s Affidavit

Roby argues that he is due relief based on T.B.'s 2007 affidavit. T.B. is one of Roby's close relatives. In her affidavit, T.B. states that L.Y. told T.B. that L.Y. testified falsely that witnesses did not use drugs on the morning of the murder and that witnesses did not talk about the murder after it happened. T.B. also states that L.Y. told her that no one saw the actual shooting. Roby argues that this affidavit would make a court "reasonably well-satisfied" that L.Y.'s testimony at trial

was false, and that without L.Y.'s false testimony, the jury might have reached a different conclusion.[6]

The claim based on T.B.'s affidavit does not satisfy the newly discovered evidence test because T.B.'s affidavit is impeaching and does not prove Roby's actual innocence. *See* Minn.Stat. § 590.01, subd. 4(b)(2). First, all of the statements in T.B.'s affidavit would be inadmissible hearsay unless L.Y. actually testified to them. *See Dobbins v. State*, 788 N.W.2d 719, 736 (Minn.2010). Assuming that L.Y. would testify to the facts alleged in the T.B. affidavit, L.Y.'s testimony would still fail the statutory test for newly discovered evidence. L.Y.'s statement that witnesses were using drugs on the day of the murder impeaches the credibility of the witnesses, but it does nothing more. Second, L.Y.'s statement that people talked about the murder after it occurred does nothing to prove Roby's actual innocence. Finally, L.Y.'s statement that no one saw the murder is simply impeaching. In sum, Roby's claim based on T.B.'s affidavit does not establish the newly discovered evidence exception.

### C.H. Affidavit

Roby argues that he is due relief based on C.H.'s 2008 affidavit. C.H. is another one of Roby's close relatives. In her affidavit, C.H. states that Roby's brother, C.T., testified falsely at Roby's trial. Specifically, C.H. states that C.T. lied about being present when Roby gave a gun to Dunn–Simmons before the shooting[7] and

---

**6.** As it did in its analysis of the claim based on the V.C. affidavit, the postconviction court applied the *Rainer* test to assess the merits of Roby's claim based on T.B.'s affidavit. The court should have applied the test from Minn. Stat. § 590.01, subd. 4(b)(2). Moreover, even had the court properly reached the merits of this claim, the *Rainer* test would not be applicable. When assessing the merits of a claim

based on false or recanted testimony, we apply the test set forth in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928). *Dobbins v. State*, 788 N.W.2d 719, 733 (Minn. 2010). But had the postconviction court applied the proper, more stringent statutory test, it would have reached the same result.

**7.** A careful review of C.T.'s trial testimony reveals that he did not, in fact, testify that

that C.T. lied about Roby bringing C.T. the murder weapon after the shooting. Roby argues that this affidavit would make a court "reasonably well-satisfied" that C.T.'s testimony at trial was false, and that without C.T.'s false testimony, the jury might have reached a different conclusion.

The evidence in C.H.'s affidavit fails the newly discovered evidence test in the statute because it cannot, as a matter of law, establish Roby's innocence by clear and convincing evidence. *See* Minn.Stat. § 590.01, subd. 4(b)(2). This is so because C.T.'s statements to C.H. are inadmissible hearsay, and C.T. is dead. Roby, however, argues that C.T.'s statements would be admissible because he made the statement in belief of his impending death. While C.H. states that C.T. made the statements in the affidavit to her while he was dying of colon cancer, the statements do not constitute "dying declarations" because they do not "[concern] the cause or circumstances of what the declarant believed to be impending death." *See* Minn. R. Evid. 804(b)(2); *State v. Eubanks*, 277 Minn. 257, 262, 152 N.W.2d 453, 456–57 (1967) (stating that Minnesota follows the traditional dying declarations exception to the hearsay rule). Because C.T.'s statements are inadmissible, C.H.'s affidavit cannot prove Roby's innocence by clear and convincing evidence.[8]

In sum, we hold that Roby's claims based on the V.C., T.B., and C.H. affidavits do not satisfy the newly discovered evidence exception in subdivision 4(b)(2).

### 2.

Roby also argues, generally, that all of his claims have merit and should be considered in the interests of justice. The elements necessary to establish the interests of justice exception are (1) "the petition is not frivolous," and (2) the petition should be considered "in the interests of justice." Minn.Stat. § 590.01, subd. 4(b)(5). In *Gassler*, we were asked to interpret the phrase "in the interests of justice." 787 N.W.2d at 586. We "explained that when the legislature uses a phrase we assume the legislature is aware of the common law understanding of the phrase and that the legislature intended to use the phrase according to its commonly understood meaning." *Id.* at 586, n. 11. We then reviewed the case law in existence when the Legislature enacted the interests of justice exception to the postconviction statute. *Id.* at 586–87. We emphasized that case law had limited the application of interests of justice relief to "exceptional situations." *Id.* at 586. We then provided specific examples of how case law had interpreted the phrase "interests of justice" in other contexts. *Id.*

We explained that, in the context of the rule announced in *State v. Knaffla*, 309 Minn. 246, 243 N.W.2d 737 (1976), the "interests of justice" exception required the claim to "have substantive merit and the defendant must not have deliberately and inexcusably failed to raise the issue on direct appeal." *Gassler*, 787 N.W.2d at 586 (citing *Deegan v. State*, 711 N.W.2d 89, 93–94 (Minn.2006)). In the context of

---

Roby gave a gun to Dunn–Simmons before the shooting. Even assuming the truth of the facts as presented in the affidavit, C.H.'s affidavit fails to meet the standard for the newly discovered evidence exception.

**8.** In *Dobbins*, we held that an evidentiary hearing may still be held based on the hearsay contents of an affidavit. 788 N.W.2d at 736.

But, in that case, there was a chance that the hearsay declarant could appear for an evidentiary hearing and affirm his statement, or that the petitioner could argue for some other hearsay exception. *Id.* at 737. Here, the hearsay declarant is dead, and Roby offers no other basis for the statement's admission.

Minn. R.Crim. P. 26.04, subd. 1(1)1, we explained that the interests of justice ground for a new trial required a court to "weigh the degree to which the party alleging error is at fault for that error, the degree of fault assigned to the party defending the alleged error, and whether some fundamental unfairness to the defendant needs to be addressed." *Gassler*, 787 N.W.2d at 587 (citing *State v. Green*, 747 N.W.2d 912, 918 (Minn.2008)). We further explained that, in the context of exercising our supervisory powers over the trial courts, we had held that the interests of justice required a new trial "to protect evidentiary rules from erosion." *Id.* (citing *State v. Kaiser*, 486 N.W.2d 384, 385–86 (Minn.1992)). Finally, in the context of the fourth prong of the plain error review standard, we had recognized that even when a plain error affected a defendant's substantial rights, a reversal of a defendant's conviction is contrary to the interests of justice if the reversal would adversely "affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citing *State v. Griller*, 583 N.W.2d 736, 742 (Minn.1998)).

Viewing the "interests of justice" language of Minn.Stat. § 590.01, subd. 4(b)(5), in light of the case law outlined above, we concluded that Gassler's claim based on the State's use of Composite Bullet Lead Analysis did "not fall into the category of exceptional cases requiring that we set aside Minn.Stat. § 590.01, subd. 4(a)'s, time bar in the interests of justice." *Gassler*, 787 N.W.2d at 587. Acknowledging that the record supported Gassler's claims that the district court admitted expert testimony later determined to have no scientific value and that the delay in filing his postconviction petition was solely attributable to conduct by the State, we nevertheless concluded that the interests of justice exception to the postconviction statute of limitations was not satisfied because the

admission of the expert testimony did not result "in a trial so fundamentally unfair to Gassler as to require us to act to protect the integrity of the judicial process." *Id.* In light of the substantial admissible evidence of Gassler's guilt, we emphasized that it would be a "miscarriage of justice" to consider Gassler's petition in the interests of justice under Minn.Stat. § 590.01, subd. 4(b)(5). *Gassler*, 787 N.W.2d at 587 (quoting *Griller*, 583 N.W.2d at 742).

We reach the same conclusion in this case. As we concluded in Roby's direct appeal, the evidence presented at trial was "overwhelmingly persuasive of [Roby]'s guilt." *Roby I*, 463 N.W.2d at 510. Roby's petition asserts that certain testimony has been recanted, but only offers potentially impeaching evidence, cumulative evidence, and evidence that is, at best, of marginal relevance. The petition, however, does not provide a basis to conclude that the interests of justice require us to set aside the time-bar in the statute. *See Rickert v. State*, 795 N.W.2d 236, 242 (Minn.2011) (concluding that the interests of justice exception was met where the petitioner had sought the service of the state public defender "well within" the statute of limitations period in subdivision 4(a), the petitioner's counsel did not receive the necessary transcript until there were only 2 days left in the limitations period, the petitioner sought and received an extension of the limitations period, and filed the petition within the extended period). Given the "substantial admissible evidence of [Roby]'s guilt" that was produced at trial, we conclude, as we did in *Gassler*, that it would not serve the interests of justice, and instead would be a "miscarriage of justice," for us to set aside the time-bar in the postconviction statute and consider Roby's petition. *See* 787 N.W.2d at 587.

In sum, we hold that all of Roby's claims are time-barred under the postconviction statute. Roby's claims based on the 1989 police report and the 2002 Dunn–Simmons letter are untimely under Minn.Stat. § 590.01, subd. 4(c). Roby's claims based on the V.C., T.B., and C.H. affidavits do not satisfy either the newly discovered evidence exception in subdivision 4(b)(2) or the interests of justice exception in subdivision 4(b)(5). These three claims are therefore time-barred under subdivision 4(a).

## II.

We turn next to Roby's argument that we should apply the doctrine of equitable tolling to, in effect, revive his untimely claims. He urges us to adopt the equitable tolling standard applied to the federal habeas corpus statute. *See Holland v. Florida,* — U.S. —, 130 S.Ct. 2549, 2560–63, 177 L.Ed.2d 130 (2010). Under *Holland,* the federal habeas corpus statute's time limit is tolled when a petitioner pursues his rights reasonably diligently but some extraordinary circumstance prevents him from filing his habeas corpus petition on time. *Id.* at 2562. It is not necessary for us to decide in this case whether equitable tolling could be applied under Minn.Stat. § 590.01, subd. 4. Because, even assuming that the equitable tolling doctrine the Supreme Court applied in *Holland* was applicable here, Roby would not be entitled to relief. We therefore assume, without deciding, that the doctrine of equitable tolling applied in *Holland* could be used to toll the limitations period in Minn.Stat. § 590.01, subd. 4.

As noted above, in order for equitable tolling to apply under the *Holland* standard, the petitioner must have diligently pursued his rights, but some "extraordinary circumstance" prevented him

from vindicating those rights. *Holland,* 130 S.Ct. at 2562. Roby argues that he meets that standard. He contends that he was diligently pursuing his rights under the postconviction statute but that prison policies constituted an extraordinary circumstance that prevented him from filing his postconviction relief petition on time. He further argues that he pursued his rights diligently because he attempted to remedy this problem. He relies on *Valverde v. Stinson,* 224 F.3d 129 (2d Cir. 2000), to support the argument that he is entitled to relief.

In *Valverde,* the Second Circuit held that equitable tolling might apply to an untimely filed habeas corpus petition when prison personnel committed misconduct by wrongfully confiscating a prisoner's completed habeas corpus petition, resulting in the prisoner filing his petition 12 days late. 224 F.3d at 132–33, 135. Roby argues that equitable tolling should be applied here under the rationale of *Valverde.* We disagree.

Roby is not arguing that a prison official intentionally targeted him or took some action that was aimed at preventing him from filing his petition on time. Roby is arguing that general policies of the prison made it harder for him to file his petition on time. Federal courts routinely recognize that the difficulties of prison life are not extraordinary circumstances warranting equitable tolling. *See, e.g., Earl v. Fabian,* 556 F.3d 717, 724–25 (8th Cir. 2009); *Lindo v. Lefever,* 193 F.Supp.2d 659, 663 (E.D.N.Y.2002) ("Transfers between prison facilities, solitary confinement, lockdowns, restricted access to the law library and *an inability to secure court documents* do not qualify as extraordinary circumstances." (emphasis added)).

In addition to Roby's failure to establish that the general prison policies constitute an "extraordinary circumstance" under the

federal test, Roby has not demonstrated that he diligently pursued his rights. *See Holland,* 130 S.Ct. at 2562–63. The prison policies that Roby relies on to prove an extraordinary circumstance require inmates to store their personal property, including legal materials, in two footlockers and to receive mail in packages weighing less than 16 ounces. Roby's legal materials would not fit in his footlockers, so he sent them to an attorney on May 25, 2007 (67 days before his filing deadline of July 31, 2007). The attorney sent the legal materials back in packages that weighed over 16 ounces. Because this did not conform to prison policy, the legal materials were returned to the attorney. The attorney eventually sent all of the legal materials back to Roby, in conforming packages, by September 2007.

Even assuming that the prison policy at issue constituted an extraordinary circumstance, Roby offers, and the record contains, no basis to toll the limitations period beyond September 2007, when Roby received the legal materials. Because Roby did not file his petition until well over a year later, he cannot be said to have been diligently pursuing his rights. Accordingly, even if the equitable tolling doctrine applied in *Holland* applies to Minn.Stat. § 590.01, subd. 4, we hold that Roby is not entitled to relief through application of the doctrine.

Affirmed.